## LAKE ERIE LAND CO. v. CHILINSKI.

1. EVIDENCE — WRITTEN CONTRACTS — FRAUD — PAROL EVIDENCE — WHEN ADMISSIBLE TO EXPLAIN.

   While, where a written instrument is unambiguous, parol testimony is inadmissible to explain, change, vary or contradict its terms, yet, where the issue is one of fraud, evidence of what was said during the preparation and execution of the instrument tending to establish the fraud, is admissible.

2. VENDOR AND PURCHASER—ABSTRACTS—MERCHANTABLE TITLE.

   If an abstract does not show on its face a merchantable title and requires parol proof to establish the fact that the title is a merchantable one, a contract agreeing to furnish an abstract showing a merchantable title is not complied with, as the abstract itself must furnish the evidence that the title is merchantable.[1]

3. SAME—LAND CONTRACTS—ABANDONMENT.

   There is an abandonment and surrender of a contract for the purchase of land by a contract purchaser, where, upon the seller demanding a past due payment and telling him that, in order to provide for the balance owing on the pur-

   ---

   [1] As to what constitutes a marketable title, see comprehensive note in 38 L. R. A. (N. S.) 1.
   On duty of vendor as to abstract of title, see note in 43 L. R. A. (N. S.) 44.

chase price due the one from whom the vendor purchased the land, it will be necessary to sell the land unless the payment is made, and the contract purchaser tells the vendor to sell the land if he has a buyer.

4. SAME—ASSIGNMENTS—RIGHTS OF ASSIGNEE.

A purchaser of land taking an assignment of a land contract running to a third person acquires simply the rights of the vendor and if the contract is unenforceable against the latter it is likewise unenforceable against the vendee.

5. EQUITY—PLEADINGS—AMENDMENTS DURING TRIAL—DISCRETION OF COURT.

It lies within the discretion of the trial court, in a suit by a contract purchaser for specific performance, to allow a purchaser of the property from the vendor to file an amended answer in the nature of a cross-bill for the removal of the contract as a cloud on the title during the hearing of the case.

6. SPECIFIC PERFORMANCE—NOT REMEDY OF RIGHT—DISCRETION OF COURT.

The remedy by specific performance is not a remedy of right, but it rests in the sound discretion of the court, and this discretion should not be exercised unless the case is clear, and should never be exercised where the moving party does not come into equity with clean hands.

7. SAME—UNCONSCIONABLE CONTRACT—DISCRETION OF COURT.

The specific performance of a contract for the purchase of real estate in favor of the purchaser will be denied where the latter is a clever and financially irresponsibe promoter and so frames the contract as to permit of protracted delays in payment, and the sellers are ignorant people of foreign extraction, and it is unlikely that any tender of payment would have been made by him except for a profitable real estate transaction, and, when pressed for payment, told the vendors to sell the property to somebody else and remained inactive until after the making of the sale.

8. SAME—EVIDENCE—ACCOUNTING.

The evidence was sufficient to show that the contract purchaser who was unsuccessful in his suit for specific performance paid for certain personal property on the land out of the proceeds of the sale of fish on the land so as to not entitle him to an accounting for such sum.

9. APPEAL AND ERROR—SCOPE OF REVIEW.
    A question which is not raised in the trial court or in the
    original brief cannot be raised on appeal.

Appeal from Wayne; Sharpe, J., presiding. Submitted April 10, 1917. (Docket No. 121.) Decided July 26, 1917.

Bill by the Lake Erie Land Company and another against Wladislaw Chilinski and others for the specific performance of a land contract. From a decree for defendants, plaintiffs appeal. Affirmed.

*Sherman D. Callender* and *Walter M. Trevor,* for plaintiffs.

*Harry H. Wait,* for defendants Chilinski.

*Wilkinson, Routier & Hinkley,* for defendant Stuart.

*Lucking, Helfman, Lucking & Hanlon,* for defendant Stanton.

FELLOWS, J. It will not be necessary or profitable to attempt a résumé of the pleadings in this case, which cover 79 pages of the record. The case must largely be disposed of as one of fact, and the pleadings are admittedly sufficient to permit disposition of the questions involved. We shall state the facts which we find established by the record, and only refer to the pleadings and the claims of the various parties as occasion may require.

Defendants Wladislaw Chilinski and Teodozia Chilinski are husband and wife. They had lived in Detroit for 30 years, Mr. Chilinski was by occupation a merchant tailor; they had accumulated some property. On December 9, 1914, they purchased from defendant Stanton, on a contract, a farm of 300 acres, located below Detroit and fronting on Lake Erie. The consideration was $25,000; $15,000 was paid in cash and property, leaving $10,000 unpaid, and of which sum

$2,000 was due December 10, 1915. Mr. and Mrs. Chilinski spent one summer on the farm. It would appear that Mrs. Chilinski grew somewhat discontented, and they became apprehensive that they would be unable to meet their payment, and decided in the early summer of 1915, that they would sell the farm. The farm, known in the record as the "Stanton Farm," was not all under cultivation. It had several houses, one called the "Club House," located near the lake, and the fishing privileges and paraphernalia were regarded as of some value.

The Chilinskis engaged several real estate agents to sell the farm for them, among them being Perry Shumway. Their price was $25,000. On August 4, Mr. Shumway brought plaintiff Lord out to the farm and introduced him as a millionaire steel manufacturer of Toledo, who wanted to buy the farm. The farm was looked over quite thoroughly, some time being occupied, during which Lord took occasion to impress Mr. Chilinski with his wealth and importance, telling him that he was part of a big corporation, one of the best furnace and steel men; that he was going to meet Mr. Carnegie shortly to purchase a large amount of steel. He also impressed upon Mr. Chilinski that he must keep the transaction secret, as he (Lord) desired to buy more land around there to put up a furnace, and apparently was much impressed with the place and wanted to buy it, although his available funds were somewhat tied up. We are clearly of the opinion that the impression then made by Lord, through his representations as to his wealth and standing, the statements made by Shumway in Lord's presence, and not disputed by him, were the procuring cause of the contract made the next day, and of the confidence reposed in Lord by the Chilinskis as to the effect of its provisions. As a matter of fact Lord was a promoter pure and simple, totally unable financially to perform

his part of the contract, with little standing in the community where he lived, with judgments and claims, large and small, hanging over him, with a record of unsuccessful promotions behind him, and without any *bona fide* belief on his part that he could swing the deal unless something turned up, or he might succeed in transferring his contract to other hands. It is patent on its face that, had not the Chilinskis believed Lord to be the prosperous business man he led them to believe he was, or had they actually known the true situation, no contract of any kind would have been entered into.

It was agreed that they should meet at Lord's office and execute the contract the next day. Shumway had put a price of $30,000 on the farm and agreed to share the excess with Mr. Chilinski. The next day the Chilinskis went to Detroit to execute the contract; they went to Mr. Lord's office on the seventeenth floor of the Dime Bank Building; the name on the door, "Border Steel Manufactory," and pieces of steel shown them, bore out the impressions created the day before. Mr. Lord prepared the contract, the Chilinskis not being represented by counsel; they took with them their contract with defendant Stanton, which Lord examined; he informed them that it was an unfair contract, and proposed to give them a better one. Considerable time was consumed in the preparation of this contract, and it was rewritten several times. Evidence was offered and received, over plaintiffs' objection, as to statements made by Lord during the preparation and execution of this instrument, which are claimed to be inadmissible for the reason that they tend to change the terms of a written instrument. The rule is well recognized that, where a written instrument is unambiguous, parol testimony is inadmissible to explain, or to change, vary, or contradict, its terms. But where the issue, as here, involves the question of

fraud, evidence of what was said, tending to establish the fraud, is admissible. Something like four or five hours were consumed in the preparation of the contract, and it was finally executed in duplicate. By its terms it provided for no down payment. The first payment of $500 was payable on delivery of abstracts showing merchantable title, certified to date of delivery. This provision Mr. Chilinski demurred to, and wanted to make it September 1st, but was assured by Lord that this was in the form of the contract and would have nothing to do with holding up the money. The next payment of $4,500 was due October 15th, $2,000 was due January 1st, and the balance in deferred payments. The contract provided for immediate possession by Lord. After the execution of the contract, and on the same day, Mr. Chilinski obtained the abstracts of Mr. Stanton and delivered them to Mr. Lord to have them certified to date; Lord representing that he could have this done more cheaply than Chilinski could. They had recently been certified, and there were no additional transfers to put on.

On August 25th a short memorandum was signed by the Chilinskis and Lord, in which the Chilinskis agreed to sell some furniture in the club house, and some nets, boats, etc., including one-half interest in the fish in the fish pen, to Lord for $150, with the proviso that $350 additional should be paid if Lord's half interest in the fish were sold for $500, with a reduction in amount proportionate to the reduction below that figure that the fish brought. August 25th Lord organized and became president of the plaintiff Lake Erie Land Company, with $1,000 capital stock, of which $500 was paid in cash by Lord's wife, 48 shares standing in her name, and 1 share each in the name of Lord and H. E. Schiller. On August 30th, Lord assigned the contract with the Chilinskis to this corporation.

It would render this opinion unnecessarily prolix to detail the many attempts of the Chilinskis to get some money from Lord, or his company, on this contract; they succeeded in getting $50. Many times Lord's excuse was that the abstracts had not been returned from the abstract office. We have already stated that the abstracts were delivered to Lord August 5th; that the only thing to be done with them was to certify them to date, less than a year from their last certificate, with no new transfers to be put on. Lord says that he did not get them until October 7th, and claims the delay is chargeable to the abstract office. It is to us, however, a significant fact that three of the four bills rendered by the abstract company for services in certifying the abstract, and which are exhibits in the case, bear date August 25th, but were not paid until October 7th. The other bill bears no date, but was also paid October 7th. It is highly improbable that these bills antedate the performance of the services, and quite probable that, had Lord been as insistent in getting the abstract back from the abstract office as he claims, he would have been successful before the 7th day of October.

A suit was commenced by one White, a real estate dealer, against Chilinski on August 31st, and garnishment proceedings were instituted against both plaintiffs. It appears from the testimony of White's former partner that White's claim was for services in making the sale to Lord, although the record does not disclose that he was active in any way in that transaction. Chilinski gave bonds in both garnishment proceedings, and the proceeding against Lord was discontinued October 5th, and that against Lake Erie Land Company October 7th.

Soon after the abstracts were returned to Lord, they were turned over to his attorney for examination. There was no unnecessary delay on the part of the

attorney in their examination. The abstracts were long and complicated; the examination careful, painstaking and exhaustive; all defects of major or minor importance were discovered and noted; the result of the examination was opinions on the different abstracts that the abstracts did not show merchantable title. Two days before the first opinion was rendered on any of the abstracts, and on October 28th, Mr. Chilinski's attorney, Mr. Wait, wrote a letter to Lord and the company, demanding return of the abstracts and payment of the sums due on the contract on or before November 1st, or in default that the contract was declared forfeited. Plaintiff's attorney wrote Mr. Wait, in reply to this letter, explaining that the demands upon his time had prevented the examination of the abstracts, and inclosed copy of an opinion as to one of them, with the claim that the abstract did not show a merchantable title. Thereafter negotiations continued between the attorney for plaintiffs and those for the Chilinskis and Stanton, and attempts were made to better perfect the record title. We are impressed that all of the attorneys were acting in the utmost of good faith; all of them believing that the transaction was a *bona fide* affair, and all of them trying to bring the deal to a conclusion; one of the suggestions being a chancery proceeding to quiet title, in which all defects appearing in the abstract might be cured. None of the defects were at all serious. We do not feel that the Chilinskis' attorney, by any act in trying to get the deal closed, waived their rights.

Through all the negotiations, and indeed throughout the litigation, it seems to be conceded that Stanton had a merchantable title, acquired through adverse possession. Most of the farm had been in the Stanton family for over 40 years, and all of it for a period beyond the statute of limitations. The distinction is most strenuously urged by plaintiffs between a merchant-

able title as matter of fact, and the showing of a merchantable title by an abstract. Counsel insists that one may have a merchantable title, even though the abstract does not show it, and urges that this contract calls for an abstract showing a merchantable title, and that the abstracts do not show it. The distinction must be recognized. This court and other courts have recognized it. If an abstract does not on its face show a merchantable title, and it requires parol proof to establish the fact that the title is a merchantable one, a contract agreeing to furnish an abstract showing a merchantable title is not complied with. The abstract itself must furnish the evidence that the title is merchantable. Quite likely Lord had this distinction in mind when he drew this contract.

Persistent demands on Lord by the Chilinskis for money were fruitless. A payment of $2,000 was due to Stanton on their contract December 10th. The fore part of that month Chilinski went to see Lord in a last attempt to get some money. Chilinski and Lord alone were present at this interview. Their testimony as to what took place is in direct conflict. We must adopt as true one or the other of their versions of the talk. Mr. Chilinski claims that he explained that he must have the money to pay Stanton in order to insure Lord's getting the place, or he would have to sell it to some one else, and that Lord told him, if he had any customer, to sell the place. Lord denies that he said this. When we take into consideration the fact that several very reputable witnesses testified that Lord's general reputation for truthfulness was bad, consider all the transactions involved in this litigation, consider the fact that for four months Chilinski had been nagging him for money, and when we carefully read the testimony of these two men, as it appears in this record, we are bound to accept the version of Chilinski as to what took place, and particularly in view of the

fact that nothing further was done by Lord until he learned that the place had been sold, when he at once became active. This must be regarded in this proceeding as tantamount to an abandonment and surrender of this contract.

The Chilinskis proceeded to sell the premises to defendant Stuart shortly after this conversation, but the deal was not closed until December 29th, when Stuart took an assignment of the Stanton contract, and deeded certain property to the Chilinskis, and paid the balance in cash. Stuart frankly states that he saw and read over the Lord contract. He was told by the Chilinskis and their attorney that the contract had been forfeited, but he made no inquiry of Lord as to his claim. We do not find that he was a *bona fide* purchaser, but by the assignment of the contract with Stanton he acquired all the rights of the Chilinskis, no more and no less. If the Lord contract was not enforceable against the Chilinskis, it was not enforceable against their assignee.

Lord soon learned of this transaction; this bill was filed on January 6, 1916, praying for a specific performance of the contract of August 5th. Prior to filing the bill no tender was made, although in the bill performance is offered. Later, and on February 16th, a tender to defendant Stanton of $2,000 was made, and on the same day a tender of $4,950 was made to defendant Stuart, and a like tender was made to defendants Chilinski. On February 15th, $2,000 was deposited with the clerk of the court as a tender of the amount due defendant Stanton; April 20th a supplemental bill was filed with leave of the court. Answers to the original and supplemental bills were filed. An amended answer in the nature of a cross-bill was filed by defendant Stuart, during the hearing of the case, by leave of the court. It was clearly within the discretion of the trial court to permit this to be done. By

this amended answer defendant Stuart asks that the Lord contract be declared a cloud on his title and removed. Defendant Stanton, in the court below and in his brief filed in this court, assumes a neutral attitude.

The case was advanced for hearing, and over a week was consumed in taking proofs. The trial court found that the Chilinskis were people of considerable intelligence, understood English fairly, but had little experience in making contracts, and little understood the meaning of many of the provisions of the contract drawn by Lord; that Lord was a clever promoter; that the contract was procured by misrepresentation, and was unconscionable; that Lord, when he procured the contract, was in no position financially to carry out its terms, and that it was procured by him for speculative purposes; that it was unenforceable in a court of equity, and should be set aside. The bill and supplemental bill were dismissed, and the prayer of defendant Stuart's cross-bill was granted. Plaintiffs were to be repaid the $50 paid to the Chilinskis and the costs of certifying the abstracts.

With this disposition of the case we agree. This bill is filed to procure the specific performance of the contract. Remedy by specific performance is not a remedy of right. It rests in the sound discretion of the court. That discretion should not be exercised, unless the case is clear. It should never be exercised where the moving party does not come into court with clean hands, with equities in his favor. This unconscionable contract was procured by this clever and irresponsible promoter from this Polish couple, by misrepresentations well calculated to beget confidence, well calculated to deceive. They were anxious to dispose of the farm. Unskilled and inexperienced in the technical phraseology of legal documents, with the glamour of a millionaire steel man surrounding Lord, they were "clay in the potter's hands." With no one

to protect their rights, Lord procured from them a contract which gave him immediate possession, with no down payment, so worded the contract as to permit protracted delays in perfecting the record title, and then told them it would not hold up the payment of their money, all the time holding himself out as a man of means, although wholly irresponsible. Had he not made a fortunate turn in a real estate deal pending this transaction, it is highly improbable any tender could have been made. Having procured the contract, he organized a $1,000 corporation, with $500 paid in, to handle this $30,000 contract, and assigned the contract to the corporation. When pressed, and pressed hard, he finally consented that Chilinski might sell to some one else, remained inactive until after the sale was made, and then filed this bill, asking a court of equity to exercise its discretion and enforce the contract. Courts of equity were not created to enforce such transactions as we find detailed in this record, but they should not hesitate to set them aside.

Some minor questions are raised by plaintiffs' counsel which require consideration. We have referred to a memorandum, made August 25th, for the sale of some personal property. It is urged that Lord has not received all of this personal property, and that part of the same is now involved in a replevin suit. Counsel insist that Chilinski should be decreed to pay the value of some or all of this property. Lord paid the $150 contemplated by this contract, by a check which went to protest. Later he paid this sum. Chilinski testifies that it was paid with money obtained by Lord from the sale of fish owned by Chilinski; Lord denies this. For the reasons already given, we give credence to Chilinski's testimony; if it is true, and we believe it is, Lord is not entitled to an accounting on this transaction. The decree of the court be-

low went as far in allowances to plaintiff as the facts justify.

In a reply brief, filed by plaintiffs after the case was submitted in this court, it is urged for the first time that Stuart is not entitled to affirmative relief, because it amounts to the enforcement of a land contract upon which the specific tax required by Act No. 91 of the Public Acts of 1911 (1 Comp. Laws 1915, § 4268 *et seq.*) has not been paid. It is not necessary for us to determine whether this is a case for the application of this statute; the question was not raised in the court below, or in the original brief; under numerous authorities, it is too late now to raise it.

The decree of the court below is affirmed, with costs to the defendants. One solicitor's fee will be allowed.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred.