## BREAR v. BAUMGARTNER.

1. CORPORATIONS—EQUITY—THAT INDIVIDUAL CARRIED ON TRANSACTIONS INVOLVED THROUGH CORPORATION WILL NOT PREVENT WORKING OUT EQUITIES.

In suit for specific performance of land contracts, where it is obvious that plaintiff carried on real estate business through instrumentality of corporation which was under his complete control and operated for his benefit, the fact that transactions involved were carried on through said corporation will not be allowed to interfere with working out equities of case.

2. SPECIFIC PERFORMANCE—ESTOPPEL.

Where, in suit by assignee of subcontract purchaser for specific performance, it appears that, in sending out notices to subcontract purchasers, including plaintiff, that, on payment in full of purchase price, defendant would give deeds to such purchasers, defendant was guided by plaintiff, latter may not claim that, by sending out such notice and accepting small payments which defendant returned on learning of her rights, she is estopped from claiming that all rights of subcontract purchasers were terminated under foreclosure proceedings.

3. Same—Equity—Plaintiff Not Entitled to Relief Unless Conduct Merits Approval of Equity Court.

Equitable relief by way of specific performance should not be granted unless plaintiff's course of conduct relative to transaction involved has been one that merits approval of court of equity.

4. Same—Plaintiff Guilty of Inequitable Conduct Not Entitled to Relief.

Where plaintiff purchased acreage on contract, subdivided it, and sold on subcontract most valuable lots therein to his son and stenographer for much less than their value, after which he defaulted and his rights and rights of subcontract purchasers were terminated by foreclosure proceedings, finding of court below that terms of subcontracts are so inequitable that prayer of plaintiff, as assignee of stenographer's subcontract, and as next friend of son, for specific performance, cannot be looked upon with favor by court of equity, was justified.

5. Same—Not Remedy of Right But of Grace.

Specific performance is remedy of grace, and not matter of right, and should be granted or not as appears to be just and equitable under the peculiar circumstances of each case.

Appeal from Wayne; Hart (Ray), J., presiding. Submitted January 7, 1930. (Docket No. 29, Calendar No. 33,879.) Decided March 6, 1930.

Separate bills for specific performance of a land contract by William H. Brear and John Brear, an infant, by his next friend, William H. Brear, against Esther Ann Baumgartner. Cases consolidated prior to hearing. From a decree for defendant, plaintiffs appeal. Affirmed.

*James Swan Eldridge,* for plaintiffs.

*Benjamin S. Pagel,* for defendant.

North, J. In these combined suits for specific performance of land contracts, the relief sought was denied on the ground that Mr. William H. Brear,

who was found to be the real party plaintiff in interest in both suits, was guilty of unconscionable, if not fraudulent, conduct in making these contracts. From a decree dismissing both cases, the plaintiffs have appealed.

Mr. William H. Brear and his wife, together with one Heenan, constituted the Bell Realty Company, a Michigan corporation. There were 100 shares of stock in this corporation. Mrs. Brear held 98 shares, and Mr. Brear and Mr. Heenan, an employee, one share each. The record fully justifies the conclusion of the trial judge that this "was a one-man corporation." It was simply an instrumentality by and through which Mr. William H. Brear carried on a real estate business. He was the secretary, the treasurer, and the general manager. He testified: "I did practically all the business for them." It was obviously under his complete control and operated for his benefit. The fact that the transactions here involved were carried on through this corporate entity will not be allowed to interfere with working out the equities of the case.

On the 18th day of March, 1920, this corporation entered into a contract to purchase from the defendant, Esther A. Baumgartner, 15 acres of land located just north of the city limits of Detroit. The contract recited a down payment, provided for subsequent payments by the corporation, and that the vendee should pay taxes and assessments. It also provided that the purchaser was to subdivide the premises, that the vendor would release any lot upon payment of $300, and for other details. The corporation did subdivide the property, which was thereafter known as the Log Cabin Park subdivision, and attempted to market the lots. The undertaking proved unsuccessful, and in the course of a few months the vendee was badly in default, both by reason of its

failure to make the specified payments to the vendor and also by reason of its failure to pay taxes. After having sold certain of the lots on subcontracts, the Bell Realty Company assigned and transferred all of its interests to one Martha Cornehl, May 16, 1922. No further payments being made on the contract, and the taxes continuing to be in default, the vendor instituted foreclosure proceedings on January 22, 1923, making both Martha Cornehl and the Bell Realty Company defendants. The final decree was entered March 1, 1924; and by it all of the rights of the defendants and of the subcontract purchasers were terminated, subject only to right of redemption, which was not exercised. The sale on foreclosure was confirmed May 1, 1924.

While William H. Brear, through the Bell Realty Company, had charge of the sale of the lots in this subdivision, and on the 27th day of March, 1920, a contract of sale was entered into for four lots of this subdivision to John Brear. John Brear is a son of William Brear, and, at the time of making these contracts, was 14 years of age, was living in the home of his parents, and to some extent assisting in the management of the real estate business which his father was conducting, and is said to have received a regular weekly compensation therefor. It is for the specific performance of the contract for the purchase of these lots that the first of these two suits is brought by William H. Brear as next friend for his son John Brear.

Ruth V. Hill was a 16-year old girl working as a stenographer in the office of the Bell Realty Company. On the 19th day of June, 1920, she also entered into a contract with the Bell Realty Company to purchase three of the lots of this addition. On the 28th day of July, 1922, she assigned to the plaintiff, William H. Brear, her rights as vendee

under this contract; and in the second suit the plaintiff seeks specific performance thereof.

As noted above, all the rights of the vendees under subcontracts were subject to the foreclosure decree taken by Mrs. Baumgartner, and were thereby terminated. But plaintiff claims that by her conduct, about to be noted, Mrs. Baumgartner is estopped from asserting that such has been the result as to the particular subcontracts which he and his son now ask to have specifically performed. This estoppel is claimed to arise from the following facts and circumstances:

On February 21, 1923, which was one month after the foreclosure suit was started, Mrs. Baumgartner mailed notice to each of the subcontract purchasers that she had taken over the Log Cabin Park subdivision, that the Bell Realty Company had no further interest therein, and that upon payment in full of purchase contracts Mrs. Baumgartner would furnish abstracts and give deeds to the purchasers. It should be noted, however, that this notice or letter was prepared by the plaintiff, sent out through his office and in accordance with advice he gave to Mrs. Baumgartner. Strangely enough, he now claims that one of these notices was sent to himself; and it is rather interesting to note that he embodied in this letter the following statement by Mrs. Baumgartner: "I having released the Bell Realty Company from all obligations, etc."

It is also claimed, and it is a fact, that subsequent to the date of the above notice, and on April 4, 1923, the plaintiff herein paid Mrs. Baumgartner as interest $4.77 on the contract which he held and a like amount on the contract outstanding in the name of his son. Mrs. Baumgartner receipted for these amounts on the respective contracts. Again, on July 17, 1923, plaintiff gave Mrs. Baumgartner his

check for $55.60 as payment of interest on the contracts in question. However, almost immediately after receiving this check, and upon being advised for the first time of her rights and the true facts surrounding this transaction, Mrs. Baumgartner returned the above check to the plaintiff and repaid to him the cash received by her on April 4th. She thereupon informed plaintiff that she would not recognize as valid the contracts here in suit or receive any further payments thereon. More than a year and a half later, and on February 24, 1925, plaintiff tendered the unpaid portion of the purchase price specified in these contracts; but the defendant refused to accept the same, and this bill of specific performance followed.

It is evident from the record that, in sending out the notices to contract purchasers, and in subsequently receiving the payments which plaintiff claims worked an estoppel, the defendant was guided by the plaintiff. From the contents of the notice, the inference may fairly be drawn that the plaintiff then had in mind producing circumstances from which an estoppel might be claimed. Plaintiff was an experienced real estate operator, and was possessed of all the details involved in these transactions, and evidently was fully advised as to both his own rights and the rights of the defendant. On the other hand, Mrs. Baumgartner was an elderly lady, of limited education, and practically no business experience. The subcontracts had been withheld from her, and she did not even know who the vendees were. She promptly returned the small payments made by the plaintiff. We think she did nothing which misled plaintiff or worked to his disadvantage in such a way as to constitute an estoppel.

In addition to the foregoing, equitable relief by way of specific performance should not be granted

to the plaintiff unless his course of conduct relative to this transaction has been one that merits the approval of a court of equity. On this phase of the case the record discloses that the lots sold to plaintiff's son and those sold to Ruth V. Hill were the most valuable lots in the subdivision. The son's lots were priced at $200 each, and those of Ruth V. Hill at $366 each. Something over 20 other lots were sold by plaintiff, and the average price of such lots is in excess of $620. In other words, it appears from this record that in dealing with his son plaintiff sold lots for less than one-third the market value, and, in making the contracts with the office stenographer, which contracts were subsequently assigned to plaintiff, the price was not much in excess of 50 per cent. of the market value. We are in accord with the finding of the trial judge that these contracts were made for the benefit of the plaintiff himself, and that the terms are so inequitable that plaintiff's prayer for specific performance cannot be looked upon with favor by a court of equity. Specific performance is a remedy of grace, not a matter of right. *Mowat* v. *Walsh,* 236 Mich. 391. It should be granted or not, as appears to be just and equitable under the peculiar circumstances of each case. *Waller* v. *Lieberman,* 214 Mich. 428.

The decree of the lower court is affirmed, with costs to the appellee.

WIEST, C. J., and BUTZEL, CLARK, POTTER, SHARPE, and FEAD, JJ., concurred. McDONALD, J., took no part in this decision.