·HIGBIE v. CHASE.

1. CONTRACTS—SALE OF CORPORATE STOCK—FINDINGS OF FACT BY TRIAL JUDGE.

In suit to set aside an alleged contract for the sale of controlling interest in the stock of a corporation, finding of facts by the trial judge was amply supported by evidence and will not be disturbed in view of trial court's better opportunity to determine credibility to be accorded witnesses who presented conflicting testimony.

Abandonment and rescission of contracts, see 2 Restatement, Contracts, § 407, comment a. See also § 500, comment c as to effect of mistake.

2. SAME—SALE OF STOCK—CONSTRUCTION OF CONTRACTS.

Provision of contract for sale of controlling interest in stock of a corporation that the purchase price was to be determined by ascertaining the true, sound, genuine net asset value of the company as of the date thereof *held*, to express clearly the method of determining the price in language understandable by persons of ordinary intelligence.

3. EVIDENCE—JUDICIAL NOTICE—BALANCE SHEET OF A CORPORATION.

The court takes judicial notice of a matter of common knowledge among all persons of business experience that seldom, if ever, does the balance sheet of a corporation or association reflect the true, sound, genuine net asset value of the firm.

4. CONTRACTS—SALE OF CORPORATE STOCK—DETERMINATION OF VALUE.

Contract providing for sale of controlling interest of stock in a corporation wherein purchase price was first stated to be determined by ascertaining the true, sound, genuine net asset value of the company as of the date thereof with provision for decrease of value of certain assets from stated book value by mutual agreement between accounting firms representing purchaser and seller was not so ambiguous as to preclude court of equity from determining intention of parties with reasonable accuracy.

5. CORPORATIONS—VALUE—APPRAISERS—ACCOUNTANTS.

To determine the true, sound, genuine net asset value of a corporation, that is, the reproduction cost less depreciation, is the work of appraisers, not accountants, bankers or men of any other profession or trade.

6. EQUITY—CONSTRUCTION OF WRITTEN INSTRUMENTS.

In construing a written instrument equity always attempts to get at its substance and to ascertain the real intention of the parties and while it will not change the wording, it will look into all the circumstances to determine the proper meaning of the transaction either to sustain a just claim or to defeat an unlawful demand.

7. CONTRACTS—CONSTRUCTION—AMBIGUITIES.

In a case involving the construction of a written instrument, especially one containing an ambiguity, the writing is to be construed most strictly against the party preparing it and responsible for the language used.

8. SAME—SALE OF CORPORATE STOCK—DETERMINATION OF VALUE—
MEETING OF MINDS.

Where contract for sale of controlling interest in stock of a
corporation first provided for determination of price thereof
by ascertaining the true sound, genuine net asset value of
the company, later provision for decrease from stated book
value of certain questioned assets by mutual consent of ac-
counting firms representing purchaser and seller was re-
pugnant to first and dominant provision, hence, first provi-
sion is controlling or contract is void as there would then be
no meeting of the minds of the parties in a common expres-
sion of will as to their legal relations.

9. SAME—ABANDONMENT—RESCISSION—EVIDENCE.

Evidence *held,* to show that after execution of contract for the
purchase of controlling interest in shares of stock of a corpo-
ration purchaser had abandoned it and seller rescinded it.

10. SAME—SPECIFIC PERFORMANCE.

A contract which has ceased to exist is not subject to be
specifically enforced.

11. SAME—RESCISSION MAY BE EXPRESS OR IMPLIED.

The agreement to rescind a contract need not be in writing nor
need it be express but it may be inferred from the circum-
stances.

12. SPECIFIC PERFORMANCE—RECORD—CONTRACTS—ABANDONMENT—
RESCISSION.

Where record may be said to show a failure to demonstrate that
there was a meeting of the minds of the parties so as to estab-
lish a contract or that a contract was established but later
abandoned by defendant and rescinded by plaintiff, defend-
ant would not be entitled to specific performance on his cross
bill.

13. SAME—DISCRETION OF COURT.

The remedy of specific performance is not one of right but
rests in the sound discretion of the court and such discretion
should not be exercised unless the case is clear.

Appeal from Oakland; Doty (Frank L.), J. Sub-
mitted June 18, 1943. (Docket No. 75, Calendar
No. 42,371.) Decided October 11, 1943. Rehearing
denied November 29, 1943.

Bill by Carlton M. Higbie and Carlton M. Higbie Corporation, a Michigan corporation, against William B. Chase and others to restrain interference with management and control of a corporation. Cross bill by defendant Shatterproof Glass Corporation, a Delaware corporation, against plaintiffs and others for specific enforcement of a contract and to restrain changes in the structure of a corporation. Decree for plaintiffs. Defendants Chase and Shatterproof Glass Corporation appeal. Affirmed.

*Clark, Klein, Brucker & Waples (Pelton & McGee,* of counsel), for plaintiff.

*Fred Dye (Butzel, Eaman, Long, Gust & Bills,* of counsel), for defendants Chase and Shatterproof Glass Corporation.

*Armstrong, Weadock, Essery & Helm,* for defendants Higbie and McAleer Manufacturing Company.

Chandler, J. The record of the testimony in the instant case is a voluminous one and shows much conflict. However such conflict appears quite largely on matters we deem of little importance to the real controversy involved herein.

We find that the facts, considering the size of the record, are so concisely and understandingly stated in the findings and conclusions of the trial court that we quote his opinion in full:

"The question in this case arises out of a purported contract under date of February 13, 1942, whereby Carlton M. Higbie Corporation, a Michigan corporation, undertook to sell and the Shatter-

proof Glass Company, a Delaware corporation, undertook to purchase 57,949½ shares of common stock, one dollar par value, of the McAleer Manufacturing Company, a Michigan corporation.

"The case also involves a contract of even date between N. Bradley Higbie, Jr., and the Shatterproof Glass Corporation for the sale and purchase of 32,130 shares of common stock, par value one dollar, of McAleer corporation. The binding effect of this particular contract is contingent upon that between the Carlton M. Higbie Corporation and the Shatterproof Glass Corporation and stands or falls with it.

"To understand the situation and the questions involved it is necessary to relate briefly some of the background leading up to the negotiations culminating in the transaction for the purchase and sale of the stock of the McAleer corporation.

"For several years the McAleer corporation, located at Rochester, Michigan, was engaged in the business of manufacturing and sale of automobile body polish and floor wax; also, as a side line, heaters for automobiles. The war situation, coupled with poor business management, put the company in an unsound financial condition.

"Visualizing the possibility of salvaging something from the company and putting it on its feet, so to speak, in 1941, the Carlton M. Higbie Corporation and N. Bradley Higbie, Jr., purchased 90 per cent. of the McAleer stock, consisting of 90,079½ shares of common stock, par value one dollar, about 61 per cent. going to Carlton M. Higbie Corporation and 29 per cent. to N. Bradley Higbie, Jr.

"The business of the McAleer corporation was taken over and operated from then on by the new owners of the stock. N. Bradley Higbie, Jr., became the president and general manager and Carlton M. Higbie, chairman of the board of directors.

"It became necessary during 1941 for the Carlton M. Higbie Corporation to advance money to the McAleer corporation from time to time in order to keep the McAleer corporation in operation.

"The financial condition of the company, owing to war conditions, did not improve, and other fields of endeavor were being considered. Late in 1941 N. Bradley Higbie, Jr., through certain contacts and suggestions from others, conceived the idea of manufacturing aeroplane flares for the ordnance department of the war department. Prime contractors were obtained, these being the Brunswick-Balke-Collender Company and the Kalamazoo Stove Company. In this way the McAleer corporation obtained an A 1 A priority rating for material to be used in the construction and manufacture of the flares. After some experimentation the McAleer company started production on a small scale. To carry out the program large amounts of money were needed and its source was in doubt.

"N. Bradley Higbie, Jr., president of McAleer and a heavy stockholder of Shatterproof Glass Corporation, located in Detroit, was on very friendly terms with William B. Chase, president of Shatterproof.

"Shatterproof Glass had also been affected by war conditions and the declaration of war by this country practically ruined its business. William B. Chase, its president, then began looking around for other fields of operation.

"Then occurred a meeting between N. Bradley Higbie, Jr., and William B. Chase, whereat the sale and purchase of the stock of the McAleer corporation was proposed, N. Bradley Higbie being anxious to sell and William B. Chase being anxious to buy.

"Before any definite commitments were made it was necessary for N. Bradley Higbie to contact his brother, Carlton M. Higbie, president of the Carl-

ton M. Higbie Corporation, a holder of the majority of the stock. This was done. Exchange telegrams· took place between Carlton M. Higbie and William B. Chase, setting forth proposals of sale and purchase of the McAleer stock.

"On February 8th, Carlton M. Higbie met William B. Chase at the latter's home in Northville. Again the details and conditions of sale were discussed to the extent that Fred Dye, attorney for Shatterproof Glass, was instructed to draft a proposed agreement to be checked by William Essery, attorney for the McAleer corporation.

"As the business of Carlton M. Higbie kept him out of Detroit a great deal of the time he agreed that N. Bradley Higbie, Jr., his brother, president of McAleer, conduct preliminary negotiations, but the final draft must be approved by Duncan McNabb, vice-president of the Carlton M. Higbie Corporation. Various drafts of the proposed contract were drawn and finally, on February 13th, one, being apparently satisfactory to both sides, was signed and is known in this case as exhibit 1. Duncan McNabb signed in behalf of the Carlton M. Higbie Corporation. Before signing it a controversy arose over paragraph 2 of the proposed contract, which paragraph reads as follows:

" 'Price: The price at which such shares shall be sold and purchased shall be determined by ascertaining the true, sound, genuine net asset value of said McAleer Manufacturing Company as of the date hereof, such value to be determined by means of a balance sheet from the books of account of McAleer Manufacturing Company to December 31, 1941, now in the process of preparation by Lawrence Scudder & Company, certified public accountants, as modified by changes therein between December 31, 1941, and this date, such changes to be determined by reference to so-called "company figures" or in such other manner as may be approved by the accounting firm of White, Bower & Prevo of

Detroit, Michigan. Any items included in such balance sheet which the purchaser may question as being in excess of true, sound, genuine asset values, shall be subject to decrease by mutual agreement between said accounting firms of White, Bower & Prevo, and Lawrence Scudder & Company, or, in the event such two accounting firms shall not be able to agree as to any item or items, by an umpire to be selected by such two accounting firms, whose decision on such item or items submitted to him shall be final. When such net asset value has been determined, such figure shall be divided by the total number of issued and outstanding shares of McAleer Manufacturing Company to determine the value per share, and such value per share, subject to the adjustments hereinafter set forth shall be applied to the shares, the subject of this agreement. The purchase price of said shares to be determined shall be subject to the following adjustments: '

"McNabb signed the proposed contract on the advice and understanding that the "true, sound, genuine, net asset value of said McAleer Manufacturing Company as of the date hereof" meant appraised value.

"Acting on this understanding of paragraph 2, McNabb sent to McAleer corporation, on February 16th, appraisers to appraise the assets of that company. This appraisal was completed February 28th. The appraisal showed something like $38,000 above the value as shown by the books of the company.

"Then trouble started and intense bitterness developed. Certain modifications to the original agreement, exhibit 1, were made, which were accepted, but the main controversy was over the interpretation of paragraph 2 of exhibit 1, which was never agreed upon. Plaintiff claims that it means "appraised value," defendant "book value." Shortly after February 13th numerous meetings were held and arguments continued to April 11th. These meetings and discussions usually revolved

upon the meaning of paragraph 2 of exhibit 1. Additions to exhibit 1, modifications of exhibit 1, substitutions for exhibit 1 were discussed, drafted and redrafted. Finally it was agreed upon that Mr. Dye and Mr. McNabb try to settle the controversy between themselves. After two days these two parties agreed upon what is known in this case as exhibit 10B. This William B. Chase refused to sign. Other proposals, such as exhibit 3, were submitted to Mr. McNabb which he refused to sign and so the arguments and controversy continued.

"In the meantime the Shatterproof Glass moved into McAleer, took possession, moved books, records, purchasing and sales departments to the offices of the Shatterproof Glass Company, at Detroit. Mr. Chase also sent employees from the Shatterproof to McAleer in Rochester and assumed general command of the situation. The agreement with N. Bradley Higbie, Jr., continued him as president of McAleer corporation but much of his authority was absorbed by Mr. Chase.

"About March 24th William B. Chase called a meeting at his home in Northville whereat he invited parties by the names of Weihe, Lowe and Hummitch, junior officers of the McAleer corporation. This meeting was called without the knowledge of N. Bradley Higbie, Jr., and with the warning that Mr. Higbie nor anyone else was to learn of that meeting. At this meeting additions to McAleer, another plant, and many other matters, most of which concerned McAleer, were discussed. The meeting lasted from about 5 p.m. to 2 a.m.

"A hammer mill was purchased at Elizabeth, New Jersey, on the priority of McAleer but sent to Shatterproof in Detroit. Six hydraulic presses were also ordered from the Kennedy company in Detroit by William B. Chase. Two hundred pounds of magnesium were purchased from the Dow company, also on the priority of McAleer, but was ordered shipped to Shatterproof Glass Company in

Detroit. Of these transactions and these secret meetings N. Bradley Higbie or the Higbie corporation knew nothing.

"Mr. Chase stated as his reason for not telling N. Bradley Higbie that Mr. Higbie was too busy and he would tell him later. He stated his reason for the purchase of magnesium and the hammer mill was to possibly build an auxiliary to the McAleer corporation.

"On February 16th McAleer was badly in need of money, so Shatterproof Glass advanced $30,000, secured by demand notes and a chattel mortgage covering all inventory, old as well as flare.

"In the meantime arguments continued. When McNabb refused to sign the paper known as exhibit 3, presented by 'Chase on March 5th, the loan by Shatterproof to McAleer was called. It was quite evident from the testimony in this case that the loan by Shatterproof to McAleer was being held as a club over the Higbie corporation to force the signing of an agreement interpreting paragraph 2, exhibit 1, in accordance with the defendant's contention.

"Upon the calling of the loan the plaintiff secured a loan from the Kalamazoo Stove Company and Shatterproof was paid.

"Negotiations and arguments continued and, while the parties could not agree, and at one time plaintiff called the deal off and then later resumed it, all this time the plaintiff advanced necessary money to the McAleer corporation for its operation.

"On March 24th an R. F. C. loan was obtained, negotiations for which had been under way for a considerable time. The loan is in the amount of $435,000, guaranted alone by the Higbies and the Carlton M. Higbie Corporation.

"The situation remained *in statu quo* until on April 9th Weihe and Lowe, who were present at the meeting on March 24th at Mr. Chase's home, revealed to Carlton M. Higbie for the first time

what took place at that meeting and also told him of the purchase of a hammer mill and magnesium.

"On April 11th Carlton M. Higbie and the Carlton M. Higbie Corporation started this suit.

"The bill of complaint charged that exhibit 1 is not a contract and never was a contract because of failure of the meeting of the minds of the contracting parties; that a conspiracy between the Shatterproof Glass Company and N. Bradley Higbie was being formed for the purpose of wrecking the McAleer corporation and asks for a permanent injunction preventing William B. Chase or the Shatterproof Glass from having anything whatever to do with the operation of the McAleer corporation and to set aside and have held for naught exhibit 1.

"The Shatterproof Glass filed answer and crossbill asking for the specific performance of exhibit 1.

"N. Bradley Higbie and the McAleer corporation filed an answer to the bill of complaint and are not asking for affirmative relief. Their position is one of neutrality and claim that their contract with Shatterproof glass for the sale of stock of the McAleer company is contingent upon the interpretation of exhibit 1 and stands or falls with it.

"The questions before the court are:

"(1)   Is exhibit 1 a contract?

"(2)   If it is a contract, what is its legal significance and interpretation?

"As to question No. 1: The elements of a contract are:

"(1)   Parties able to execute.

"(2)   A good and sufficient consideration.

"(3)   A subject matter to be contracted for.

"(4)   An agreement by offer and acceptance, or, in other words a communication and meeting of minds whereby the parties come together in a common expression of will as to their legal relations.

"It is admitted that the first three elements exist, but there is a dispute over the fourth, plaintiff claiming that it is lacking, defendant, Shatterproof, that it is present.

"The question of the meeting of the minds revolves around paragraph 2, exhibit 1, as hereinbefore stated.

"There was a great deal of testimony on the part of the plaintiff and the Shatterproof Glass touching upon this question, most of which was in direct conflict.

"The means of determining the price for the payment of the stock of the McAleer company, while left to future determination in exhibit 1, was never agreed upon and could not be agreed upon from February 13th, the date of execution, to April 11th, when this suit was started, and all efforts on the part of the court to have the parties agree on the construction of paragraph 2, exhibit 1, failed.

"Bearing upon the question of the meeting of the minds, the testimony produced by plaintiff ·is the more convincing and reliable.

"The testimony of William B. Chase, principal witness for defendant, presents a picture of sharp dealing, conniving, will-to-win-or-ruin policy and evasiveness.

"Defendants contend book value is what exhibit 1, paragraph 2 means, but their own witness, Harry Prevo, public accountant, testified that there are at least five different kinds of value:

"(1) Market value.

"(2) Forced sale value.

"(3) Reproduction cost, less depreciation, meaning sound value.

"(4) Value placed on earnings.

"(5) Book value.

"Therefore, book value and sound value, as set forth in paragraph 2, exhibit 1, do not mean the same thing.

"In the opinion of the court there was no meeting of the minds for many reasons, among them:

"(1) Plus factors were discussed previous to the making of the contract but are not included in exhibit 1.

"(2) Appraisers sent to Rochester by McNabb in accordance with his understanding of exhibit 1.

"(3) William B. Chase objecting to appraisers and claiming exhibit 1 gave no one the right to make an appraisal.

"(4) Various drafts of documents and changes made in them from February 13th on.

"(5) Promise of William B. Chase to finance McAleer and then calling his loan.

"(6) The chattel mortgage covered all inventory, old as well as flare, which Higbies understood was not to be the situation.

"(7) The phrase "shall be subject to decrease," paragraph 2, exhibit 1, was not so understood by McNabb when he signed exhibit 1.

"(8) Buying a milling machine, magnesium, hydraulic presses by William B. Chase with the apparent idea of Shatterproof absorbing McAleer.

"I therefore hold exhibit 1 is not a contract and is null and void as such.

"In view of this holding the question of specific performance asked by defendant and cross-plaintiff need not be considered.

"Even if exhibit 1 were held to be a contract the court would deny specific performance because William B. Chase and Shatterproof Glass are not in court with clean hands.

"The theory of conspiracy set forth in the bill of complaint in this case is not sustained, there being no evidence to that effect.

"Decree may be entered in accordance herewith."

After a careful review of the record we determine that the findings of fact of the trial judge should not be disturbed. His opportunity of reaching a conclusion as to the facts, which should control from the testimony adduced, was much better than ours. The credibility to be accorded the witnesses produced was for him to pass on, and we think his

findings are amply supported by competent evidence.

Counsel for all party litigants are in accord that the entire controversy between them revolves around paragraph 2 of the contract, quoted by the trial court, and to which we will have occasion to refer to in this discussion.

Paragraph 1 of said contract states:

"Seller (Higbie corporation) agrees to sell and purchaser (Shatterproof corporation) agrees to purchase all seller's shares of common stock, $1 par value, of McAleer Manufacturing Company, a Michigan corporation, held or owned by the seller, consisting of 57,949½ shares of such stock on the terms and conditions herein outlined."

Then follows paragraph 2, the interpretation of which is involved in this suit.

Preliminary to any discussion of this controversy, it is well to note that the contract in question was prepared by the attorney for the Shatterproof corporation.

It is also well to note that the first part of paragraph 2 declared and set forth in language clear, specific and unambiguous that the price at which the stock in the McAleer corporation should be sold and purchased "shall be determined by ascertaining the true, sound, genuine net asset value of said McAleer Manufacturing Company as of the date hereof." The latter part of paragraph 2 which is inconsistent with the above is as follows:

"Any items included in such balance sheet which the purchaser may question as being in excess of true, sound, genuine asset values shall be subject to decrease by mutual agreement between said accounting firms."

If the words "included in such balance sheet" were eliminated from the remainder of said paragraph 2, we cannot imagine anyone claiming that there is any ambiguity whatsoever as to the true meaning of the method to be applied in determining the value of said stock.

Appellant states the questions involved in this appeal as follows:

"(1)   Was the contract of February 13, 1942, between plaintiff Carlton M. Higbie Corporation and defendant Shatterproof Glass Corporation, which appears in the record as exhibit (1), a valid and enforceable contract?

"(2)   At the time of the execution of the contract of February 13, 1942, between Carlton M. Higbie Corporation and Shatterproof Glass Corporation, which appears in the record as exhibit (1), did the mind of the parties meet on all of the terms and conditions of said contract?

"(3)   Is appellant Shatterproof Glass Corporation entitled to a decree specifically enforcing the contract of February 13, 1942, between Carlton M. Higbie Corporation and Shatterproof Glass Corporation, which appears in the record as exhibit (1)?

"(4)   Is appellant Shatterproof Glass Corporation entitled to a decree specifically enforcing the contract of February 13, 1942, between N. Bradley Higbie, Jr., and Shatterproof Glass Corporation which appears in the record as exhibit L?"

Plaintiff and appellee accepts same with the addition of the following questions:

"(5)   Was the instrument of February 13, 1942, between Carlton M. Higbie Corporation and Shatterproof Glass Corporation, which appears in the record as exhibit 1, too uncertain and indefinite to be a valid and enforceable contract?

"(6)  Was the instrument of February 13, 1942, between Carlton M. Higbie Corporation and Shatterproof Glass Corporation, which appears in the record as exhibit 1, rescinded or abandoned prior to the commencement of this action?"

The trial court, after a full hearing, resolved the foregoing questions in accordance with the contention of plaintiff and appellee and contrary to the contention of appellant, and entered a decree granting plaintiff the relief prayed for and dismissing appellants' cross bill of complaint.

We are in accord with that portion of the decree granting plaintiff injunctive relief and dismissing appellants' cross bill. However, we are not in harmony with the conclusions reached by the trial court that exhibit 1 was not a contract because there was no meeting of the minds of the parties thereto, but do reach the conclusion after a review of the record that said contract (exhibit 1) was impliedly, at least, rescinded prior to the commencement of this suit, and that the conduct of appellant leads to a reasonable inference that it was the intention of Chase to divert unfairly and illegally as much of the business of McAleer as possible to Shatterproof and was in effect an abandonment of the contract in question.

A review of all the facts and circumstances preceding the execution of exhibit 1 and immediately following is convincing to us that the sale and purchase price was clearly intended to be and was fixed and determined by the parties as plainly and specifically set forth in the preamble, the declaratory part of the agreement, wherein it was stated that said price "shall be determined by ascertaining the *true, sound, genuine net asset value of said McAleer Manufacturing Company* as of the date hereof."

We do not have to refer to a dictionary, nor to a certified public accountant for a connotation of these words. Every person of ordinary intelligence is familiar with and knows the exact meaning to be accorded them.

It is also a matter of common knowledge among all persons of business experience, and we take judicial notice thereof, that seldom, if ever, does the balance sheet of a corporation or association reflect the *true, sound, genuine* net asset value of a corporation or company. In fact, in the instant case, the appraised values of the assets of the Mc-Aleer company were in excess of net book values as shown by the audit by over $35,000.

Harry M. Prevo, a certified public accountant and a member of the accounting firm then employed by appellant, was a witness for appellant. He testified:

"There are a great many methods for valuing the assets of a going corporation. One would be present cash sale value, what you could get if you could sell it, that is known as market value, the price a willing seller would sell to a purchaser, ready, willing and able to purchase and none of them being under any compulsion. Another method besides market value is the forced sale, what you could get for it if you put it under the hammer today. Another method would be the reproduction cost less depreciation, which appraisers often call the sound value. They determine what it would cost to build the plant at today's cost and take off the depreciation in accordance with the age of the property. That is called the sound appraised value, but these would not be the same as the present cash value. Another method would be to determine what it earned, value it on the basis of its prior earnings, like always valued by people in the stock market, the value of the earnings. There are

probably others. Book value is a method we have already discussed.''

He had previously testified as to book values. These, he had said, were determined from the balance sheet.

It must be conceded that there are some inconsistencies in paragraph 2 of the contract in question relative to the method of arriving at the price to be paid for the McAleer stock, but we do not think they are fatal to the validity of the agreement. The inconsistent language there used is not equivocal enough, and does not render the paragraph too ambiguous to preclude the court from determining with reasonable accuracy the intention of the parties as expressed therein. We find the most essential provision in the contract in question is the price to be received by plaintiff and to be paid by appellant. It is as important as the habendum clause in a deed, determinative of the interest granted, or the term clause in a lease, fixing the period of the tenant's rights unless modified in no uncertain terms by other provisions. Here the price in unequivocal terms was first set forth to be on the sale basis of the *true, sound, genuine net asset* value of the McAleer company, which according to appellants' own accountant and witness meant ''reproduction cost less depreciation.'' To determine this would be the work of appraisers, not accountants, bankers or men of any other profession or trade. It would be the work of those rendered competent by reason of experience and sound judgment to determine the true, sound, genuine net asset value. It was the dominant feature of said agreement.

The following language used in said paragraph 2 ''any items included in such balance sheet which the

purchaser may question as being in excess of true, sound, genuine asset values, shall be subject to decrease by mutual agreement by said accounting firms'' is repugnant, it is true, to the first provision in said paragraph definitely fixing the method of arriving at the consideration.

We think the language from the opinion of the late Mr. Justice FEAD in *J. J. Fagan & Co.* v. *Burns,* 247 Mich. 674 (67 A. L. R. 522), quite significant. The issue there involved was the interpretation of an oil and gas lease where there were repugnant clauses relative to the term period. The lower court held the term and development clauses inconsistent, and that the latter modified the former, and was entitled to ''additional consideration'' because it was later in the instrument. Justice FEAD said:

''This reasoning is in conflict with the decisions of this court, which give pre-eminence to the first of repugnant clauses. *Putnam* v. *Railroad Co.,* 174 Mich. 246; *Mullreed* v. *Thumb,* 116 Mich. 440; 35 C. J. p. 1179.

''By the great weight of authority, the term clause, which is the habendum clause, dominates the period for which the lease shall run, so that, unless it is properly modified by other provisions, all rights of the lessee cease at the expiration of the fixed time stated in the term clause, except in the one contingency that at the expiration of such time the lessee is actually producing oil and gas on the premises.''

We hold, as was held in the above-cited case, that in the interest of ''certainty, uniformity of construction and security of rights'' the dominant part of said paragraph 2 is the first few lines thereof which in no uncertain terms fixes the consideration to be paid for the McAleer stock. To do otherwise would be doing violence to the intention of the par-

ties clearly expressed in the agreement as a whole. In 21 C. J. p. 204, it is said:

"In the construction of a written instrument, equity always attempts to get at its substance, and to ascertain, uphold, and enforce the rights and duties that spring from the real intention of the parties. In 'doing so, while it will of course not change the words of the instrument, the court of equity will look into all the circumstances under which it was made, in order to determine the proper meaning of the transaction. It will do this not only to sustain a just claim, but to defeat an unlawful demand."

See, also, *Psutka* v. *Michigan Alkali Co.*, 274 Mich. 318.

It should be borne in mind that appellants and their attorney drafted the contract involved. The authorities, so far as we are able to ascertain, are uniform in holding that in a case involving the construction of a written instrument the writing is to be construed most strictly against the party preparing it and responsible for the language used. In *Patterson* v. *Miller,* 249 Mich. 89, 95, we said:

"The Miller mortgage was drafted by Miller's attorney in his own office and the general rule of law is that, where there is ambiguity in an instrument it is most rigidly construed against the person who drafted it."

See, also, *Thomson Electric Welding Co.* v. *Peerless Wire Fence Co.,* 190 Mich. 496.

Even if we are in error in our interpretation of paragraph 2 and the authorities we have cited are inapplicable to the instant case, the appellant can derive no comfort. If the two provisions discussed are absolutely repugnant and irreconcilable, and

utterly fail to make clear the intention of the parties to the contract, then it is apparent that one of the essentials to the validity of a contract, viz: "a meeting of the minds of the contracting parties in a common expression of will as to their legal relations" is absent, and the agreement is void. *Cummer* v. *Butts,* 40 Mich. 322 (29 Am. Rep. 530); *Durgin* v. *Smith,* 133 Mich. 331; *W. C. Sterling & Son Co.* v. *Watson & Bennett Co.,* 193 Mich. 11; *Malooly* v. *York Heating & Ventilating Corp.,* 270 Mich. 240.

We have heretofore in this opinion indicated that it is our judgment that this contract had been abandoned by appellant and rescinded by plaintiff prior to the institution of this suit. Some elucidation might not be out of place on this phase of the case.

A few days after the execution of the contract, plaintiff set appraisers from the Manufacturers Appraisal Company at work on an appraisal of the assets of the McAleer corporation for the purpose of determining the true, sound, genuine value of such assets.

Appellant, after learning of the appraisal, entered a protest, insisting that the book value as shown by the balance sheet should be the consideration and not the *true, sound, genuine* value. Attempts to compromise these differences between William B. Chase and Carlton M. Higbie caused a widening of the breach between them and much bitterness ensued.

After futile efforts to negotiate a new contract or a compromise, a secret meeting of the junior officers of McAleer and Mr. Chase was held at the insistence of Mr. Chase at his home, being the meeting referred to by the trial court in his opinion, with the warning that neither the Higbies nor any one else was to know of that meeting nor the matters

discussed. The real purpose of this meeting as fairly disclosed by the record was the discussion of plans to take over the McAleer business by Shatterproof, without the purchase of the McAleer stock, unless the Higbies would accept his, Chase's, interpretation of the contract. There was testimony of two witnesses to the effect that Chase said he would acquire the stock of McAleer on his own terms or wreck the company. We think it was this evidence together with the conduct and testimony of Chase that prompted the trial court to say,

"The testimony of William B. Chase, principal witness for defendant, presents a picture of sharp dealing, conniving, will-to-win-or-ruin policy and evasiveness."

A week or so after the secret meeting, plaintiff was apprised of the same by some of the participants, as well as of its purpose and of the attitude of the dominant figure of appellant in regard to the contract.

We find from the record here that the conduct of appellant permits of no other inference than that the contract in question had been abandoned and that the plaintiff, prior to the institution of this suit, rescinded the same.

In *Eddy* v. *St. Charles Land Co.* (C. C. A.), 271 Fed. 254, the court, in holding that the contract involved therein had been rescinded and abandoned by the conduct of the parties, said:

"The appellant's conduct and expressions * * * [were] inconsistent with the continued existence of the contract in question or of an intention on the part of the appellant to comply with his obligations under the contract or to exact performance by the land company. * * * The contract was

capable of being abandoned or rescinded by an express or implied agreement between the parties to that effect (cases cited). Of course a contract which had ceased to exist is not subject to be specifically enforced.''

In *LeMieux* v. *Cosgrove,* 155 Minn. 353 (193 N. W. 586), the court said:

''It is well settled that the parties to a bilateral contract may agree to rescind it. The agreement to rescind need not be in writing nor need it be express. It may be inferred from the circumstances.''

We believe that we have fully discussed all of the questions involved as stated by the parties excepting the ones stated in numbers 3 and 4 of appellants' statement of questions involved.

In view of what we have said in our discussion of the other questions, we think we have effectually disposed of these issues raised by appellants wherein they claim that they are entitled to relief under their cross bill seeking a decree requiring specific performance by appellees.

We might add that we think it is a well-established legal principle that a rescission or abandonment of a contract may be established by the acts and conduct of the parties and that manifestly such rescission or abandonment will defeat a bill for specific performance.

This court has repeatedly held that the remedy by specific performance is not one of right. It rests in the sound discretion of the court, and that discretion should not be exercised unless the case is clear. *Lake Erie Land Co.* v. *Chilinski,* 197 Mich. 214; *Brear* v. *Baumgartner,* 249 Mich. 633; *MacGlashan* v. *Harper,* 299 Mich. 662.

Entertaining these views, we find that the decree entered by the trial court should be, and the same hereby is, affirmed, with costs to plaintiffs and appellees.

BOYLES, C. J., and NORTH, STARR, WIEST, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred.