22 N.J. Super. 439 (1952)
92 A.2d 52
ROBINSON G. HOLLISTER, PLAINTIFF-RESPONDENT,
v.
THEODORE FIEDLER, EXECUTOR OF THE ESTATE OF WILLIAM C. FIEDLER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 14, 1952.
Decided October 29, 1952.
*441 Before Judges EASTWOOD, GOLDMANN and FRANCIS.
Mr. Harold D. Feuerstein argued the cause for the plaintiff-respondent (Messrs. Feuerstein and Sandles, attorneys).
Mr. Samuel R. Blaine argued the cause for the defendant-appellant (Mr. Louis Auerbacher, Jr., attorney).
The opinion of the court was delivered by EASTWOOD, S.J.A.D.
Prior to February 1, 1944, plaintiff and William C. Fiedler, deceased, were engaged independently in the insurance business in Newark, New Jersey, and on that date they became associated in Fiedler Agency, Inc., a corporation owned by William C. Fiedler and engaged in the sale of insurance. Mr. Hollister thereafter undertook the management of the corporation and subsequently the name of the company was changed to Fiedler and Hollister, Inc.
On May 18, 1945, Fiedler and Hollister, Inc., Robinson G. Hollister and William C. Fiedler, entered into two written agreements, one providing for the employment of the individual parties and the terms thereof, the other an option agreement concerning the surviving member's right to purchase stock of the predeceasing member in their insurance corporation known as Fiedler and Hollister, Inc. It is this last-mentioned agreement about which the controversy has arisen.
William C. Fiedler died August 29, 1950. Thereafter the plaintiff gave timely notice to the defendant indicating his intention to exercise the option to purchase the decedent's stock as provided in the aforementioned agreement. After an audit had been made by the corporation's accountant from which plaintiff asserts it was determined that the shares of stock had no book value, plaintiff made no tender to the *442 defendant, but merely demanded the delivery of the shares of stock. Consequent upon a refusal, this action was instituted in the Chancery Division for the specific performance of the agreement, resulting in a judgment for the plaintiff. It is from this judgment that the defendant appeals.
The option agreement recites that the individuals, Fiedler and Hollister, are each the owner of 11 shares of capital stock of Fiedler and Hollister, Inc., and thereafter provides, inter alia:
"4. Upon the death of Fiedler or Hollister, the survivor of them, if still in the employ of the Company, shall have an option to purchase the shares of stock of the Company owned by the other upon the following terms and conditions:
(a) Such survivor shall give written notice of the exercise of this option within sixty (60) days of such death to the personal representative of the deceased party or, in the absence of such personal representative, to his next of kin.
(b) Within thirty (30) days of the giving of such notice as aforesaid, the survivor exercising the same shall tender to the legal representative of the deceased party, or, in the absence of such legal representative, to the next of kin of the deceased party, the book value of the shares of stock of the Company held by him, and shall agree to pay or cause to be paid to the lawful widow of such deceased party, if any there be, an amount equal to 25% of the net profits of the Company earned from and after the date of such death, determined after payment of all expenses, including all federal, state and local taxes, but before deducting therefrom the amount of any compensation payable by the Company to such surviving party, for the term of her natural life, or until the death of said surviving party, whichever shall first occur; and
(c) Thereupon, the surviving party shall acquire all the right, title and interest in the shares of stock of the Company held by the deceased party."
The defendant contends that the trial court erred in: (1) interpreting the option agreement in a manner that worked a forfeiture upon the defendant; (2) that "book value" under the agreement was meant to comprehend all assets of the corporation including the value of expiration and renewal books and records, which were not included as assets in plaintiff's audit; (3) that in any event the audit presented by plaintiff does not indicate a full and complete *443 picture of the assets of the corporation because no consideration has been given to the valuable expiration and renewal books and records of the business; (4) that the court's exclusion of testimony as to the value of these last-mentioned books and records as an asset of the company was error and similarly that testimony as to the value of the good will as an asset of the company was erroneously excluded; (5) that the court erred in concluding "that the book value of the Fiedler stock was nil"; (6) that "The Court erred in concluding that plaintiff was an employee of Fiedler & Hollister, Inc. within the contemplation of the terms of the option agreement and that plaintiff was thus qualified to exercise the right of option"; and (7) that one share of stock formerly registered in the name of Mrs. Fiedler and transferred at her death to Jean Hollister is the property of the decedent's estate.
The plaintiff argues that the books showed a deficit as of September 30, 1950, in the sum of $1,303.79, and as of December 31, 1950 the deficit amounted to $2,816.40; that by mutual consent, from 1945 to August 29, 1950, the books of account were set up and maintained on a cash basis, as distinguished from an accrual basis; that if the decedent desired to consider the value of the expirations, he could have provided for same in the option agreement or instructed the accountant to make provision therefor, and inasmuch as a standard practice had been maintained with respect to the corporate books over a period of years, the executor can claim no greater benefits; that "book value" as used in the contract reflects the value as carried on the books of the corporation and, particularly, as appears on the balance sheets.
It is an elementary rule that the function of the court is not to make contracts but to enforce them and to give effect to the intention of the parties as of the time the contract was made. In Clott v. Prudential Ins. Co. of America, 114 N.J.L. 18, 20, 21 (Sup. Ct. 1934), it was said: *444 "* * * The standard of interpretation of an integrated agreement is the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the writing, other than oral statements by the parties of what they intended it to mean, except where it produces an ambiguous result, or is excluded by rule of law establishing a definite meaning. This is termed a primary rule of interpretation which is always applicable, whether the writing seems clear or ambiguous. The ascertainment of the expressed intention of the parties is the prime object of the interpretation of all written contracts. * * *"
The court must regard the relation of the parties and the circumstances under which the contract was made, and the objects which the parties were thereby striving to accomplish. Such an inquiry is not for the purpose of changing the writing, but to secure light by which to ascertain its actual significance. Corn Exchange, &c., Phila., v. Taubel, 113 N.J.L. 605, 608, 609, 610 (E. & A. 1934). Cf. Verhagen v. Platt, 1 N.J. 85, 88 (1948); Moses v. Edward H. Ellis, Inc., 4 N.J. 315, 323 (1950). And so here, the entire transaction between the parties must be considered in arriving at a determination of the intent of the parties as expressed in the agreement in question.
In the agreement dated February 1, 1944, whereby Hollister became associated with Fiedler, it was provided:
"7. * * * It is further understood and agreed that in the event of the death of said Robinson G. Hollister prior to February 1, 1945, the estate of Robinson G. Hollister shall become the owner of the expirations of any accounts, which, as shown by books and records of Robinson G. Hollister, and partially indicated on attached list, had been on his books prior to February 1, 1944, and the estate may sell, transfer or otherwise dispose of the interest in such business without the permission or consent of Fiedler Agency, Inc."
It is to be noted that the parties regard the records of expirations of particular value commanding special consideration in the event of termination of business association.
Similarly, in the agreement dated May 1, 1945, it was provided:
*445 "12. If either of the individual parties hereto shall leave the employ of the Company or fail to hold office therein for any reason whatsoever, such party shall be free to take with him as his sole property all interest in expirations and renewals of business and all other business of the individual parties hereto as shown by their respective books, as of February 1, 1944, and, in addition thereto, one-half of all new business (including interest in expirations and renewals of business) acquired by the Company subsequent to January 31, 1945."
The plaintiff argues that this only applied to a situation that might develop during the lifetime of the parties. But, we think that a reading of this provision clearly dispells the thought that it was agreed that one party might, on disassociation with the business, take with him or acquire more than his proportionate share of the assets and reaffirms the indication that the parties considered the list of expirations or records of renewals of considerable value demanding special attention.
In the conduct of an insurance business, aside from the ability of the salesman to obtain customers to purchase insurance contracts, perhaps the most valuable asset is information as to who may be in the market for insurance protection and when the most likely time would be to solicit them. That pertinent information is obtained from the list of expirations or records of renewal dates for existing insurance contracts. This has been recognized by the parties in that plaintiff's original purchase of stock in the Fiedler Agency, Inc. was made with his record of renewals or list of expirations from his individual business. In fact, the accountant testified "If you took the expirations away from the business, you would have no business."
Defendant argues with considerable merit that the audit performed by the company accountant for the six years of business association with the plaintiff was with a view to reflecting earnings for the purpose of reporting taxable income and as such was on a strict cash basis. Specifically, the accountant testified as follows:
*446 "Q. In considering your assets did you take into consideration the value of the expirations of Fiedler & Hollister, Inc.? A. No. May I 
Q. Just a minute. On August 29, 1950, did you know what the value of the expirations of Fiedler & Hollister were? A. No.
Q. Was the policy register wherein the expirations are noted, of Fiedler and Hollister, Inc., ever under your control and supervision? A. No.
Q. You at no time made an audit of that account? A. No, sir.
Q. You knew at all times that you were auditing an account of an insurance agency, did you not? A. Yes.
Q. Why? A. Well, that was the part that I want to bring in, when I wanted to interrupt you. You see, it was a type of audit that I was hired to do, and my auditing was in no way a detailed audit. Actually what it really was my audit was what would be a balance sheet audit and to file the tax return, and that's all Mr. Fiedler ever wanted from me and that's what I was paid for. In other words, the accounting fees would show that that's all I was paid for. In other words, if they wanted all that stuff they would have to pay me a lot bigger fees, more time spent."
Considered from that standpoint, expiration lists are not a revenue producing asset prior to the date of renewal of the contract of insurance and, therefore, do not show up on a cash basis audit which reflects income until subscription and payment. However, where an audit is to be made to determine the value of one's business, the net worth thereof, an accurate statement is not reflected without due consideration to the whole of the business and the assets thereof, including in this instance, the asset of records of renewals.
It is this last-mentioned calculation of net worth which we perceive was intended by the parties in their use of the term book value to be employed in arriving at the price at which the surviving member might acquire the stock of the predeceasing member in the firm of Fiedler and Hollister, Inc. This view is supported, and directed by the express language of the parties, in the 1944 and 1945 agreements, wherein they attribute special significance to the list of expirations on dissolution of the firm or a member's disassociation therewith and provide for special handling thereof.
*447 The meaning to be attributed to the words "book value" depends upon the construction of the specific language used in the particular instrument wherein that term is stated. In Black's Law Dictionary (4th ed. 1951), "book value" is defined: "As applied to stock, the value shown by deducting liabilities and other matters required to be deducted from assets, Elhard v. Rott, 36 N.D. 221, 162 N.W. 302; Gurley v. Woodbury, 177 N.C. 70, 97 S.E. 754, 756." Words and Phrases, vol. 5, defines "book value" as: "`Book value' of stock is not any arbitrary value that may be entered upon books of a corporation, but value as predicated upon market value of assets of corporation after deducting its liabilities. Townsend v. La Crosse Trailer Corp., 35 N.W.2d 325, 328, 254 Wis. 31." In Lane v. Barnard, 173 N.Y.S. 714 (App. Div. 1919), the court stated:
"In a suit for specific performance of a contract for sale of corporation stock between employees of the corporation, whereby, if any party should die or sever connection with the corporation, the others might purchase his common stock at actual book value, evidence held not to sustain a finding that defendant did not know that the good will of a partnership to whose right the corporation succeeded, was not carried on the books as assets of the corporation; `book value' meaning the value of the stock as shown by the assets and liabilities as carried on the books."
Where, as here, the accountant concedes that the balance sheet statements he audited did not represent the accurate valuation of the stock, particularly in that it did not reflect the value of the list of expirations or renewal records, and in the absence of express language excluding this asset from the computation of stock value the result is an inaccurate result unintended by the parties and works an inequitable result upon the parties. It is a rule of construction that the presumptions are in favor of reasonableness and against the imputation of hardship and inequities and preponderate in fairness to the contracting parties. If we were to carry to its logical conclusion the contention of the plaintiff that because the balance sheets failed to include any valuation of the insurance expirations, then, assuming that the corporation *448 owned a valuable building or automobiles or other valuable property which were not carried on the corporation's balance sheets, he would, as owner of all the stock, acquire such property without being required to pay for same. As we construe the agreement, we do not believe that the parties had any such intention. Anfield v. Love, 5 N.J. Super. 347, 351 (App. Div. 1949); Washington Construction Co., Inc., v. Spinella, 8 N.J. 212 (1951).
The testimony is clear that the list of expirations, and especially the life insurance renewals, had a definite market value. Therefore, the court should have admitted proofs as to the value thereof in reaching a determination of the true book value of the stock of the corporation.
While the judgment makes a disposition of the one share of stock transferred at the death of Mrs. Fiedler to Mrs. Hollister, we find that neither the complaint nor the pre-trial order embraced any such issue. The plaintiff insisted that it was not an issue in the cause and although there is some testimony concerning it, neither the complaint nor the pre-trial order was amended to comprehend that issue. This issue not being properly before the court, it was error for the court to include it in the judgment.
We have considered the other contentions advanced by the defendant-appellant and conclude that they are without merit.
For the reasons hereinbefore stated, the judgment is reversed. The matter is remanded to the Chancery Division to ascertain the value of the list of expirations so that together with other assets and liabilities a complete and accurate determination of the book value of the stock may be made.