22 A.3d 991 (2011)
421 N.J. Super. 134
ESTATE OF Claudia L. COHEN, by its Executor Ronald O. PERELMAN, Plaintiff-Appellant,
v.
BOOTH COMPUTERS and James S. Cohen, Defendants-Respondents.
Docket No. A-0319-09T2
Superior Court of New Jersey, Appellate Division.
Argued April 5, 2011.
Decided July 13, 2011.
*993 Michael R. Griffinger argued the cause for appellant (Gibbons P.C. and Greenbaum, Rowe, Smith & Davis, L.L.C., attorneys; Mr. Griffinger, Kevin McNulty, Lan Hoang, Newark, and Paul A. Rowe, Woodbridge, on the brief).
Benjamin Clarke argued the cause for respondents (DeCotiis, FitzPatrick & Cole, L.L.P., attorneys; Frank Huttle, III, of counsel; Mr. Clarke, Russell J. Passamano and Erik Corlett, Teaneck, on the brief).
Before Judges CARCHMAN, GRAVES and ST. JOHN.
The opinion of the court was delivered by
CARCHMAN, P.J.A.D.
In this appeal, we address the question of whether, under the facts presented, a family partnership agreement that provides for a buyout based on net book value may be enforced where the disparity between book value and market value is significant. In deciding this issue, we consider the difference between book value and market value as well as addressing the issue of whether the disparity between the two renders the agreement unconscionable and unenforceable.
We conclude, as did the trial judge, that the formula utilized in calculating net book value was appropriate, the buyout agreement was enforceable, and the disparity between book value and market value does not render the agreement unconscionable.
Plaintiff Estate of Claudia[1] Cohen, by its executor, Ronald Perelman, appeals from a judgment awarding $178,000 for Claudia's interest in defendant Booth Computers (Booth), a family partnership *994 in which her brother, defendant James Cohen, was also a partner. Plaintiff argues that the trial judge erred in finding that, under the buyout provision of Booth's partnership agreement, it was entitled to only the net book value of Claudia's interest in the partnership, as reflected in Booth's financial statement at the time of Claudia's death, rather than the fair market value of that interest, which plaintiff claims was $11,526,162.
Judge Contillo, in the Law Division, concluded that the value set forth in the financial statement was the "net book value," the language of the buyout clause was not ambiguous, and was supported by substantial credible evidence in the record. The award did not render the partnership agreement unconscionable because of the disparity between fair market value and book value; moreover, there was a similar buyout after the death of the other Booth partner ten years prior.

I.
These are the relevant facts developed during the trial of this dispute.
Robert Cohen, Claudia and James's father, amassed a considerable fortune through his ownership and control of various business entities, including the Hudson News group of companies, a distributor of newspapers and magazines. He and his wife, Harriet, were the parents of three childrenClaudia, Michael and James.
According to James, Robert requested a partnership agreement be prepared for the benefit of his children. The agreement was not negotiated but presented to the children for signature. Apparently, the partnership was formed by Robert to purchase and lease computer equipment, but this never came to fruition. At the time of Booth's formation, Claudia was twenty-seven, Michael twenty-one, and James nineteen.
James did not know who drafted the agreement but assumed that it was his father's attorney. He received the document from his father but did not recall whether he understood all its provisions, including paragraph sixteen, which governed buyouts of the partners. He did understand that the general concept of the partnership was to create a vehicle to produce income for the children. Neither he nor his siblings consulted an attorney before signing the agreement.
The agreement created Booth Computers and provided in part:
11. The Partnership shall maintain books and records setting forth its financial operations and said books and records shall reveal all monies received and expended on behalf of the Partnership. Such books shall be kept on a calendar year basis and shall be closed and balanced at the end of each year. An audit shall be made at the end of each year, or more often, as desired by the Partners.
....
13. Each of the Partners recognizes and agrees that one of the reasons he has entered into this Partnership is the personal and family relationship which exists among all Partners and that none of
the partners wishes to enter into a partnership with non-family members. In furtherance of the foregoing, each of the Partners covenants and agrees that during his lifetime he shall not sell, assign, transfer, mortgage, pledge, encumber or otherwise dispose of all or any part of his interest in the Partnership, except upon the terms and conditions and subject to the limitations as hereinafter set forth in Paragraphs 14 and 15 of this Agreement.
*995 The agreement also contained a buyout provision, to be implemented under certain conditions:
15. In the event of the divorce or separation of any Partner who is married, and upon the death of any Partner, the remaining or surviving Partners shall be obligated to purchase, in equal shares, and the divorced Partner or Partner whose marriage is being terminated, or the estate of a deceased Partner, as the case may be, shall be obligated to sell the entire interest in the Partnership theretofore owned by such Partner at the price and upon the terms and conditions hereinafter set forth in this Paragraph 15;
(A) The price at which such Partnership interest shall be sold shall be the value thereof, determined in accordance with the provisions of Paragraph 16;
....
16. The purchase price of any part or all of a Partner's interest in the Partnership shall be its value determined as follows:
(A) Each of the Partners has considered the various factors entering into the valuation of the Partnership and has considered the value of its tangible and intangible assets and the value of any goodwill which may be present. With the foregoing in mind, each of the Partners has determined that the full and true value of the Partnership is equal to its net worth plus the sum of FIFTY THOUSAND ($50,000.00) DOLLARS. The term "net worth" has been determined to be net book value as shown on the most recent Partnership financial statement at the end of the month ending with or immediately preceding the date of valuation;
(B) The value of any interest in the Partnership which is sold and transferred under the terms of this Agreement shall be determined by multiplying the full and true value of the Partnership as above determined by that percentage of the capital of the Partnership which is being sold and purchased hereunder.
One of the entities created by Robert, Periodical Distributors of Florida, Inc. (Periodical), owned an oceanfront estate in Palm Beach, Florida. Periodical had purchased the property in 1976 for $750,000.
On May 26, 1978, a partnership known as HCMJ Realty Ltd. (HCMJ) was formed in Florida; its general partners were Robert and Harriet, while Booth was a limited partner. According to HCMJ's certificate of incorporation, Booth's initial capital contribution was $90,000, for which it received a forty-five percent minority interest in HCMJ. Cyril Hermele, a certified public accountant who prepared Booth's tax returns, indicated that the initial $90,000 investment by Booth was reflected as a capital contribution, but as time passed, payments made on behalf of the property reduced that figure until it became a negative number. Howard Joroff, Hudson News's controller in the 1980s and 1990s, noted that HCMJ's books were kept by Robert's secretary.
According to Hermele, Booth's cash receipts and disbursements were kept on a general ledger. Catherine Oberg, Hudson's chief financial officer, indicated that a bookkeeper who worked for Robert would enter the deposits and checks written, which produced a trial balance of the debits and credits. HCMJ's tax returns were based on these records, according to Hermele, and any distributions to the partners were generally made at Robert's direction. Periodical conveyed the Florida property to HCMJ on September 1, 1978, and Robert continued to assume the maintenance costs of the house.
*996 Booth's assets were not limited to the Florida property, as in 1980 and 1984, it acquired two commercial warehouse buildings in Egg Harbor, which generated rental income for the partnership. According to Joroff, in 1992, Booth invested in Jacobs, Jacobs, Cohen & Booth, a firm that owned and leased property in Massachusetts.
James began working for Hudson News in 1980 and became its president in 1994. In 1985, Claudia married Perelman, and they had one child, Samantha, who was born in 1990.
According to James, no accounting firm reviewed, or certified, Booth's financial statements. Hermele did not audit Booth's financial documents while Joroff prepared financial statements for Booth from 1983 to 2001.
In 1994, Claudia and Perelman divorced. The parties to this action stipulated that the buyout provision of the partnership agreement was not invoked at that time because family ownership of the partnership was not threatened by the divorce. According to James, he told Claudia six months after the divorce that he and Michael were not going to exercise the buyout provision.
Michael died on June 30, 1997. In July 1998, beyond the sixty days set forth in the partnership agreement, James and Claudia invoked the buyout provision and Michael's estate was paid $34,503.08 for his one-third interest in Booth based on the formula in paragraph sixteen of the partnership agreement. The book value as of the date of Michael's death was set forth in a handwritten document as $47,650.20. The $50,000 required by the buyout provision of the partnership agreement was added, resulting in a total of $97,650.20. Michael's one-third share was $32,550.07.[2]
James assumed that the buyout calculation was made by his father's employees. He also discussed the buyout with Claudia, and he and Claudia each contributed $17,251 for the buyout. Thereafter, Booth's tax returns reflected that James and Claudia each had a fifty percent interest in the partnership. Although James wrote a check to Michael's estate for the amount due, Claudia's share was deducted from her partnership distributions.
Claudia died on June 15, 2007. On July 13, 2007, Ronald Kochman, another of Robert's attorneys, sent a letter on James's behalf implementing the buyout in the sum of $177,808.50. Attached to the letter was a balance sheet of Booth's assets and liabilities as of June 30, 2007, listing Booth's cash assets as $166,056, with $97,548 subtracted for HCMJ's negative value. Net land, property and equipment was listed as $357,842, for total assets of $426,352. Liabilities were $120,735, while total equity was $305,617. Net income was $110,402. The calculations were not a year-end financial statement, but a balance sheet and income statement created for the purpose of the buyout. The statement was reviewed by Oberg. According to Oberg, the negative $97,548 figure came from HCMJ's K-1 form. That figure appeared on Booth's 1998 tax return and remained static from that point forward.
The estate then sent a letter requesting that Booth produce its financial statement for 2006, monthly financials for the first half of 2007, the composition of a $300,000 distribution made to the partners in 2007 and an explanation regarding the HCMJ *997 notation on the balance sheet. Booth produced the monthly financials and the composition of the distribution but not the audited financial statements the estate had requested.
HCMJ was dissolved in the fall of 2008. As part of the dissolution, James paid, on his own behalf, over $1 million for "an additional six percent interest in the" Palm Beach property, thereby establishing a majority interest in the property when that figure was added to the forty-five percent owned by Booth, of which he was now the sole partner. The Palm Beach property had been appraised at $30,772,860 in 2006. The parties stipulated that the combined fair market value of the two buildings in Egg Harbor at the time of Claudia's death was $2,755,000.
In his decision on the parties' motions for summary judgment, the judge denied defendants summary judgment on count one (unconscionability) because that question could not be resolved summarily due to unresolved factual disputes. However, he rejected plaintiff's argument that the buyout provision of the agreement was not enforceable because it had been waived by defendants, stating:
There is no dispute that the partners did not invoke the buyout provisions in 1994 following Claudia's divorce from Perelman. However, this failure whether it was a conscious choice or inattention to detail... cannot show that James, or Michael, "clearly, unequivocally, and decisively" waived his right to invoke the buyout provision. Rather, Plaintiff can only show that, on the singular occasion of Claudia's divorce from Perelman, Michael and James did not enforce the buyout provisions of the Partnership Agreement.... This Court cannot reach the conclusion that based on this non-enforcement there was an "intentional surrender" of the rights granted by the buyout provisions so as would bar the siblings from the rights and protections of the buyout provisions in future instances, including, as here, the death of one of the siblings.
[(Citations omitted).]
The judge further rejected plaintiff's claim that resolving the waiver issue by way of summary judgment was inappropriate:
[T]he Court finds no genuine issue of material fact about James's intentions regarding the enforceability of the buyout provisions. First, we have James's admittedly self-serving statements of intent. Second, there is no evidence that suggests that the remaining partners, following Claudia's divorce from Perelman, and following Michael's death, ever considered those buyout provisions to be null and void. These circumstances are fatal to [p]laintiff's argument that James had affected a waiver of his rights to invoke the buyout provisions following Claudia's death in 2007.
At trial, Oberg noted that Booth had no employees, and that its assets were recorded at cost, not fair market value. Expenses such as insurance, real estate taxes and utility bills relating to an asset, such as the Florida property, were also recorded at cost. Booth's books and records were kept by Hudson personnel.
Plaintiff offered Dennis Kremer, a forensic accountant, as its expert. He claimed that he could not render an opinion as to Booth's net book value from the June 30, 2007 statement because it was unreliable, incomplete and "fraught with numerous errors in terms of how they're prepared." Kremer opined that Booth's interest in HCMJ should have been appraised at "full value." He did not utilize the income method of valuation because "the substantial portion of property [was] not income producing" but combined *998 Booth's cash on hand as of the time of Claudia's death, $168,058, with its forty-five percent interest in HCMJ, which he determined to be $20,250,000, and the stipulated value of its two New Jersey properties, $2,755,000, resulting in a total asset value of $23,173,058.
Kremer then subtracted the $120,735 in liabilities as reflected on Booth's balance sheet, which resulted in a "full value" of $23,052,323. To that figure was added the $50,000 as required by the partnership agreement, for a final total of $23,102,323. Plaintiff's interest was half that total, $11,551,161.
Michael Slade, plaintiff's appraisal expert, valued the Palm Beach property, as of June 15, 2007, at $45 million. He utilized the sales comparison, or market, approach and relied on four comparables, which had sold between July 2006 and August 2006 for between $40,481,100 and $47,266,400, to arrive at the $45 million figure.
Michael Cannon, defendants' appraisal expert, valued the Palm Beach property at $30 million in its condition as of the date of Claudia's death. He utilized both a sales comparison and cost approach. He found that it would cost $23.5 million to restore the structure to the "grandeur" of other estate homes in the Palm Beach market.
David Colston, a structural engineer concluded that it would cost $442,000 for concrete repair work on the main floor and the basement ceiling of the Palm Beach house.
Sam Rosenfarb, a certified public accountant and defendants' expert in accounting and business valuation, concluded that the purchase price of the estate's interest in Booth was $177,809. He opined that book value is identified by the books and records of an entity, and reflects cost, as opposed to fair market value, which requires an appraisal.
According to Rosenfarb, from an accounting perspective, it would have been "completely erroneous" for Booth to reflect the fair market value of the Palm Beach property on its books. The tax code and generally accepted accounting principles require that an investment in a partnership be recorded at cost and added that it was very common for investments in real estate to have a negative value. He disagreed that Booth's books and records were unauditable because it was easy to check the cash balance with the relevant banks. He did not find any discrepancies between Booth's tax returns and its books and records.
In his decision, the judge found that the fair market value of the Florida property was $45 million. He noted that the three children had neither created nor negotiated the partnership agreement. Rather, the agreement was the "brainchild and creature of the parents ... prepared at the direction of one of Robert Cohen's lawyers." Moreover, he found that the testimony did not illuminate the meaning of the buyout provision. With respect to that issue, Judge Contillo concluded:
Had the partnersor their parents intended to provide for the buyout of a deceased or divorcing partner's interest at fair market value, they could easily have said so. They plainly did not provide for a [buyout] at fair market value.
The financial statements of Booth the tax returns and the books and records of the Partnershiphave never reflected the market value approach to net worth, but rather have only reflected a cost approach.
....
The value of Booth's interest in HCMJ has never been reflected on the books and records of Booth, or of *999 HCMJ, with any reference at all to the underlying, shifting actual or fair market value of HCMJ's sole assetthe Palm Beach property. Rather, the tax returns of Booth ... list the book value of Booth's interest in HCMJ as a negative value, without reference to any market value.
....
[W]hat is consistently reflected ... is... the value of the Partnership as ... a cost value, less distributions, plus contributionswithout regard to actual value.
....
[I] find that the phrase net worth ... was not defined as full and true value, but rather that full and true value was defined, specifically, to be book value.
In support of his conclusion, the judge observed:
I find that the actual historical treatment of value by Booth over the years comports with the plain language of the buyout provisions: no reference to actual, market value, but rather consistent reference to standard business practices applicable to this business and most businessvalue pegged to book value, which, in turn, reflects costs, does not reflect increases or decreases in asset values, but does change depending upon whether additional contributions are made and/or withdrawals or distributions taken.
The record establishes that when the brother Michael Cohen died in 1997, his interest was bought out, leaving Claudia and James the sole remaining partners of Booth. Michael's interest in Booth was bought out at a figure not remotely reflective of the actual value of the Palm Beach property.
As to plaintiff's argument that the failure to conduct annual audits violated the partnership agreement, he concluded:
No audits were ever done. No partner... ever insisted that audits be done. This is unsurprising: Booth was a simple, family partnership that owned 2 warehouses, plus a share in a family limited partnership. Like many small family business constructs, it was run informally, and was not 100% scrupulous in its bookkeeping protocols. But it always filed annual tax returns. And those tax returns always reflected the income of the partnership, and its expenses, and the value of the interest in the limited partnership, HCMJ, and the state of the partners' capital accounts. Everything needed to ascertain the book value of Booth at any particular time was readily available from the books and records, including tax returns, of the company. The failure to audit the company books on an annual basisor everdoes not trigger a nullification of the [buyout] provision of the Partnership Agreement because no partner ever requested it and because the [buyout] pricepegged as it is to book value, as opposed to fair value, or market value can be readily ascertained when the need arises from the company's records.
Finally, the judge rejected plaintiff's argument that the buyout provision was unconscionable:
The terms and conditions of the Agreement, handed down by the parents, crafted by their counsel, were equally applicable, to each child.
The book value [buyout] formula was properly applied when Michael died. It resulted in a [buyout] of Michael's share... not remotely related to market value, fair value, or actual value.... Applying the formula dictated by the Agreement to the Estate of a previous beneficiary of application of the exact same mandated formula weighs strongly in favor of not vitiating the formula now.

*1000 And there is nothing inherently offensive in the specified [buyout] procedure. I find that in fact many small, family businesses have the same or similar formulasbook value, based fundamentally on cost, for easily and quickly buying out the interest of a deceased family member. Pegging the value to "fair value" or market value invites exactly the sort of disruptive litigation (from the family's perspective) occurring here. Setting the pay out, rather, at the more formulaic book value, is artificial but easily ascertainable, readily applicable to the estate of whichever family member may have passed away, or divorced. It shields the family partnership from destruction through the avenue of intra-family litigation.
....
Under the totality of the circumstances, the Estate has failed to prove that enforcement of the Agreement is unconscionable. The fair and equal origin of the terms of the agreement mitigate against such a finding. The prior, proper application of the formula with respect to the Estate of the deceased brother Michaeland the [unfair] market value thereby yieldedweigh heavily against a present finding of present unconscionability. The fact that the formula could have left any one of the children ... in sole ownership of the Partnership, with the others' interest satisfied for radically below fair market rates[,] also weighs heavily against a finding of unconscionability.
The judge dismissed plaintiff's complaint and granted judgment on defendants' counterclaim specifically enforcing the partnership agreement. This appeal followed.

II.
Before addressing the issue of valuation, we briefly address plaintiff's argument that the judge erred by granting summary judgment on plaintiff's claim of waiver. The waiver argument is premised on two factual circumstancesthe failure to invoke the buyout provision after Claudia's divorce and the failure to invoke the provision in a timely manner after Michael's death.
Waiver is the intentional relinquishment of a known right. Marino v. Marino, 200 N.J. 315, 340, 981 A.2d 855 (2009). The party charged with waiver must know its legal rights and deliberately intend to relinquish them. Ibid. Questions of waiver are usually questions of intent, which are factual determinations ordinarily inappropriate for summary judgment. Shebar v. Sanyo Bus. Sys. Corp., 111 N.J. 276, 291, 544 A.2d 377 (1988).
The failure to buy out Claudia after her divorce does not raise a factual issue as to intent. James spoke to Claudia after her divorce and told her that he and Michael were not going to exercise their buyout option as the divorce posed no risk of a transfer to a non-family member. Plaintiff does not dispute these facts.
The same is true of James's and Claudia's buyout of Michael's interest after his death, apparently in accordance with the buyout clause. Even though the buyout may not have been timely exercised, the fact remains that it was exercised by James and Claudia without objection. This negates any suggestion of waiver.
A party waiving a known right must do so "clearly, unequivocally, and decisively." Knorr v. Smeal, 178 N.J. 169, 177, 836 A.2d 794 (2003). No germane issue of material fact is presented to suggest that defendants waived their right to exercise the buyout provision of the partnership agreement upon Claudia's death. *1001 The judge properly granted summary judgment to defendants.

III.
We now address the issue of valuation. Plaintiff asserts that the trial judge erred in finding that defendants were entitled to specific performance of the buyout provision based on book value rather than fair market value. It maintains that the judge's interpretation of the phrase "net book value" conflicts with two of our prior decisions, and that the term is sufficiently ambiguous to encompass fair market value. We disagree.
To establish a right to specific performance, the party seeking the relief must demonstrate that the contract in question is valid and enforceable at law, and that the terms of the contract are clear. Marioni v. 94 Broadway, Inc., 374 N.J.Super. 588, 598-99, 866 A.2d 208 (App. Div.), certif. denied, 183 N.J. 591, 874 A.2d 1109 (2005). Whether a term of a contract is clear or ambiguous is a question of law. Nester v. O'Donnell, 301 N.J.Super. 198, 210, 693 A.2d 1214 (App.Div.1997). Here, defendants claim that the buyout provision is clear so that they are entitled to specific performance of the buyout provision of the partnership agreement.
Book value is defined as:
Accounting terminology which gives a going-concern-value for a company. It is arrived at by adding all assets and deducting all liabilities and dividing that sum by the number of shares of common stock outstanding. . . . The valuation at which assets are carried on the books, that is, cost less reserve for depreciation.
[Black's Law Dictionary 165 (5th ed.1979).]
See also Shannon P. Pratt, Robert F. Reilly & Robert P. Schweihs, Valuing a Business, 913 (4th ed.2000). Fair market value is defined as "[t]he amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts . . . in the open market. . . ." Black's Law Dictionary 537 (5th ed.1979).
While book value reflects the cost of the asset as reflected on the entity's books, fair market value reflects the asset's value in the open market. It is not unusual for the two values to vary and in many instances, as here, differ substantially.
We recognize the disparity between net book and fair market value, yet the controlling factor as to which buyout method is applicable is the language of the partnership agreement. As has been noted:
Partnership interests purchased at book value . . . are to be repaid . . . at book value . . . where the partnership agreement so provides, and an agreement for the purchase of a withdrawing partner's interest in the partnership assets on the basis of an amount computable from the partnership's books cannot be interpreted to require a settlement based on the appraised value of all partnership assets and liabilities at the time of withdrawal, unless the agreement is affected by fraud, accident, mistake, or the parties' failure to clearly state their intent.
[59A Am.Jur.2d Partnership § 636 (2003) (footnotes omitted).]
Cf. Fortugno v. Hudson Manure Co., 51 N.J.Super. 482, 503, 144 A.2d 207 (App. Div.1958) (noting that when dividing partnership assets upon dissolution, "[t]he written partnership agreement is the measure of the partners' rights and obligations"). The buyout provision provides that the "full and true value" of the partnership *1002 for purposes of a buyout "is equal to its net worth plus the sum of FIFTY THOUSAND ($50,000.00) DOLLARS. The term `net worth' has been determined to be net book value as shown on the most recent Partnership financial statement.. . ."
Plaintiff relies on our decision in Hollister v. Fiedler, 22 N.J.Super. 439, 442, 92 A.2d 52 (App.Div.1952) (Hollister I), where book value of the corporate stock in an insurance brokerage was set forth as the standard in the buyout provision. We reversed the judgment of specific performance to the surviving shareholder, based on a negative book value of the shares found by the plaintiff's accountant, because the insurance brokerage company's balance sheets did not include the value of some of its assets, the list of expirations or renewal records. In sum, the statements did not represent the accurate value of the company's stock. Id. at 447-48, 92 A.2d 52. We remanded for further consideration of value.
On appeal from the remand, Hollister v. Fiedler, 30 N.J.Super. 203, 206, 104 A.2d 61 (App.Div.1954), mod. on other grounds, 17 N.J. 239, 111 A.2d 57 (1955) (Hollister II), after the trial court had again found that the stock had no value, we noted that the defendant had offered testimony from expert witnesses that an expiration and renewal record is a recognized asset of an insurance broker's business. Id. at 208, 104 A.2d 61. The experts assigned a market value to that asset of between $16,500 and $30,000. Id. at 209, 104 A.2d 61. In addition, the company had annual gross premiums averaging approximately $25,000. Id. at 210, 104 A.2d 61. We concluded that the asset "had some relatively substantial value which in turn gives value to the corporate stock." Id. at 209, 104 A.2d 61.
As to specific performance, we concluded that the plaintiff had failed to clearly and convincingly establish his right to acquire the stock without paying any compensation whatsoever. Ibid. We held that the shares of stock had a value manifestly in excess of the deficit stated on the balance sheet, and that the defendant was entitled to an accounting of the value of the stock. Id. at 211, 104 A.2d 61.
Here, the trial judge distinguished the Hollister cases:
Obviously, book value that entirely omits an asset is not a proper basis for ascertaining book value. By contrast, Booth valued each of [its] few assets on its books. It did so, not on fair market value but on the common business method of cost, plus contributions, less withdrawals/disbursement. I reject a reading of Hollister that would suggest that all companies must carry assets on their books at fair market value!
As Judge Contillo noted and we agree, nothing in either Hollister opinion stated that book value has to be determined by fair market value. Nor has any New Jersey case after Hollister so held. Rather, unlike here, the balance sheet in Hollister failed to place any value on the stock, negative or positive. Ultimately, the valuation of the shares in Hollister was not prompted by a choice between fair market value and book value, but in essence, a default valuation at fair market value necessitated by the absence of any basis to value the assets at book value. Read in the context of its unique facts, Hollister's definition of book value as the market value of assets after deducting its liabilities, 22 N.J.Super. at 447, 92 A.2d 52, does not support plaintiff's argument.
Plaintiff further asserts that the language of the buyout clause at issue here called for fair market value, not book value. It contends that the clause equated *1003 "net book value" with "full and true value," and that the latter contemplated market value. However, the term "full and true value" was merely a descriptive phrase indicating that what followed was full and true value, specifically, net book value. We will not torture the language of a contract to create an ambiguity. Nester, supra, 301 N.J.Super. at 210, 693 A.2d 1214.
Plaintiff also suggests that fair market value should have been utilized because the language of the buyout provision was ambiguous. There is no single definition of book value that can be applied in all cases. Lambert v. Fishermen's Dock Coop., Inc., 61 N.J. 596, 604, 297 A.2d 566 (1972). In this instance, use of the term "net worth" in addition to "book value" did create some confusion. Yet, these terms have been found to be synonymous. See N.J.S.A. 54:10A-4(d) (providing that net worth means the aggregate of the values disclosed by the books of the corporation). Moreover, the partnership agreement specifically states that "the term `net worth' has been determined to be net book value. . . ."
In an analogous situation, Lambert, supra, 61 N.J. at 604, 297 A.2d 566, the Court interpreted the meaning of "fair book value" in a buyout provision. The Court determined that the phrase meant the value as set forth in the company's books, without reference to the then present market value. Id. at 605, 297 A.2d 566. The Court further noted that this was the construction given in prior buyouts. Ibid. In both its interpretation of the language prefacing "book value," and its reliance on past buyouts, Lambert supports the trial court's construction here.
Other jurisdictions have taken a different view as to the definition of the term book value. In Schumann v. Samuels, 31 Wis.2d 373, 142 N.W.2d 777, 778 (1966), the court held that "book value" in the relevant buyout provision was ambiguous. It stated that because the partnership agreement did not define book value, under Wisconsin law the definition was the market value of the assets after deducting its liabilities. Id. at 778-79. See also Malkus v. Gaines, 476 So.2d 220, 222-23 (Fla.Dist.Ct.App.1985) (noting that in the absence of an agreed upon definition of book value for purposes of a buyout, it should mean market value less liabilities).
Nothing in New Jersey law suggests that the term book value, without further definition or explanation, is inherently ambiguous. Nor is there any requirement that the term be defined in an agreement in order to avoid a claim of ambiguity. Schumann and Malkus are not applicable here. "Net book value" is defined in the partnership agreement.
Plaintiff further relies on Higbie v. Higbie, 306 Mich. 577, 11 N.W.2d 248, 250 (1943), where the relevant clause stated that the price was to be determined by ascertaining "genuine net asset value," to be determined from the company's balance sheet. The court noted that "seldom, if ever, does the balance sheet of a corporation" reflect its "genuine net asset value. . . ." Id. at 254. Since the corporation's accountant stated that "genuine net asset value" meant reproduction cost minus depreciation, the value of the company's stock could not be determined by an examination of its balance sheet. Ibid. Here, there is no reference to "asset value" in the partnership agreement, and defendants' experts did not concede that value should be determined by any other method other than book value. Higbie is not persuasive here.
The trial judge's determination that Claudia's shares should be bought out at book value, rather than fair market value, was supported by both substantial credible *1004 evidence and the applicable law. The judge did not err in holding that defendants established their entitlement to specific performance of the buyout provision as a matter of law.

IV.
Plaintiff next contends that even if book value was the proper measure of the buyout price, a reliable book value determination could not have been made to provide the basis for a legitimate buyout price because Booth's books and records violated the partnership's recordkeeping requirements. Specifically, plaintiff cites the failure to have annual audits performed and to issue regular financial statements, as well as inaccurate and incomplete bookkeeping.
Booth never undertook to have a certified audit of its books. However, annual financial statements were compiled by Oberg and Joroff. Compilations and reviews of books and records are not audits, but rather accounting services. D.R. Carmichael, Steven Lilien & Martin Mellman, Accountants' Handbook § 35.3(a) (7th ed.1991). The express language of the partnership agreement did not require an audit in order to effect a buyout. It only required that the partnership's financial statement at the end of the month preceding the valuation be used. That the June 30, 2007, balance sheet was created specifically for the buyout does not mean it was inaccurate, nor does plaintiff challenge the accuracy of the figures in that document.
While no New Jersey cases have addressed this issue, in Hons v. A. Bertolla & Sons, 537 So.2d 456, 457 (Ala.1988), the partnership agreement called for an independent audit of the books of the business upon the death of one of the partners to determine the net worth of the business as shown on its books. The decedent partner's estate in Hons claimed that this provision required the accountant to independently verify the figures in the books, not simply to accept those figures. Id. at 458. In rejecting this argument, the court stated: "Although the term `audit' connotes an element of proof and substantiation, clearly the objective of the `audit,' as the term was used in the buy-back provision, was simply to arrive at the book value of the business as shown by the books themselves. . . ." Ibid.
Similarly, here, the June 30, 2007 statement satisfied the requirement in the buyout provision, and was an effort to arrive at the book value of the partnership as shown by the books themselves. Any contravention of the audit requirement did not warrant rejecting the book value as supported by the financial statement.
Recordkeeping requires that "the books have been kept accurately and in accordance with sound and recognized accounting practices." Lambert, supra, 61 N.J. at 605, 297 A.2d 566. The proofs support the finding that the books and records were kept in accordance with sound accounting principles. Plaintiff points to the failure to produce all the financial statements and all the tax returns for the partnership; yet, as we have noted, the record contains a number of state and federal tax returns, balance sheets, general ledgers and annual statements. Plaintiff failed in its proofs to establish anything untoward regarding the value placed on the partnership as of the date of Claudia's death. The records were sufficient to determine book value.

V.
Plaintiff next argues that, in the absence of an express definition of "net book value" in the agreement, or extrinsic evidence of it, the judge should have utilized the gap-filling provisions of the Uniform Partnership Act, N.J.S.A. 42:1A-1 to -56 (UPA), *1005 which provides for fair value. We reject the argument as we have previously noted that the language in the buyout clause was not ambiguous, eliminating any necessity for applying the UPA.
N.J.S.A. 42:1A-34 provides:
a. If a partner is disassociated from a partnership without resulting in a dissolution and winding up of the partnership business . . . except as otherwise provided in the partnership agreement, the partnership shall cause the disassociated partner's interest in the partnership to be purchased for a buyout price as determined pursuant to subsection b. of this section.
b. As used in subsection a. of this section, "buyout price" means the fair value as of the date of withdrawal based upon the right to share in distributions from the partnership unless the partnership agreement provides for another fair value formula.
[(Emphasis added).]
Where the partnership agreement fails to set a fair value buyout formula, the UPA will "fill the gap" by requiring that the buyout price be fair value. "To the extent the partnership agreement does not otherwise provide, this act governs relations among the partners and between the partners and the partnership." N.J.S.A. 42:1A-4(a).
"Fair value" has been defined as requiring consideration of proof of value "`by any techniques or methods which are generally acceptable in the financial community and otherwise admissible in court.'" Dermody v. Sticco, 191 N.J.Super. 192, 196, 465 A.2d 948 (Ch.Div.1983) (quoting Weinberger v. UOP, Inc., 457 A.2d 701 (Del.1983)). Both net book value and fair market value, as generally accepted techniques of valuation, can constitute fair value.
The partnership agreement did provide for "another fair value formula," namely, net book value. Plaintiff's argument is premised on the conclusion, without more, that the agreement "did not provide a valid and workable method for calculating a buyout price." We disagree. The agreement provided for a recognized standard of valuation with an additional $50,000 increase to the buyout. This was a valid and workable basis for calculating the buyout.

VI.
Plaintiff contends that the trial judge erred in not finding defendants' buyout price to be unconscionable given the "gross disparity" between the cost approach they utilized and the fair market value approach plaintiff seeks. It points to the result of the judgment, whereby James will take sole possession of an asset worth sixty times greater than the amount paid to Claudia's estate.
As an equitable, as well as legal, remedy, the right to specific performance turns on whether the performance sought represents an equitable result. Marioni, supra, 374 N.J.Super. at 599, 866 A.2d 208. A trial judge's determination on this question will be reviewed for abuse of discretion. Id. at 601, 866 A.2d 208.
In Sitogum Holdings, Inc. v. Ropes, 352 N.J.Super. 555, 800 A.2d 915 (Ch.Div.2002), the trial judge reviewed the law regarding unconscionability. He noted that application of the doctrine has always been viewed as controversial and that its use has been infrequent; the reason being concern over the potential for decisions based on personal value judgments. Id. at 560, 800 A.2d 915. Unconscionability cases focus on two factors: (1) *1006 unfairness in the formation of the contract; and (2) excessively disproportionate terms. Id. at 564, 800 A.2d 915.
The first factor, procedural unconscionability, includes age, literacy, lack of sophistication, hidden or unduly complex contract terms and bargaining tactics. Ibid. The second factor, substantive unconscionability, "simply suggests the exchange of obligations so one-sided as to shock the court's conscience." Id. at 565, 800 A.2d 915.
New Jersey case law "clearly include[s] both the procedural and substantive unconscionability concepts," but those concepts are applied flexibly. Id. at 567-68, 800 A.2d 915. "[T]his court fails to see why . . . a[n unconscionability] claim should be barred if some unknown barrier for both factors is not surpassed instead of allowing such a claim to succeed when one factor is greatly exceeded, while the other only marginally so." Id. at 567, 800 A.2d 915.
While there is a dearth of authority in New Jersey addressing the issue of unconscionability in the context of price disparity, other jurisdictions generally hold that disparity in price alone does not constitute unconscionability. See G & S Invs. v. Belman, 145 Ariz. 258, 700 P.2d 1358, 1367 (1984) (finding that weight of authority rejects the view that fair market value should prevail over book value based on equitable considerations). Cf. Anderson v. Wadena Silo Co., 310 Minn. 288, 246 N.W.2d 45, 48 (1976) ("it would be inequitable to require a partner to sell his interest in a partnership for a price which does not reflect its true value unless it is clear that the partner explicitly agreed to do so.").
Disparity in price between book value and fair market value, where a buyout provision is clear, is not sufficient to "shock the judicial conscience" and to warrant application of the doctrine of unconscionability. This view is consistent with the basic principle that where the terms of the contract are clear, it is not the court's function to make a better contract for either of the parties. CSFB 2001-CP-4 Princeton Park Corp. Ctr. v. SB Rental I, LLC, 410 N.J.Super. 114, 120, 980 A.2d 1 (App.Div.2009). See also G & S Invs., supra, 700 P.2d at 1368 (refusing to rewrite buyout provision "based upon subjective notions of fairness arising long after the agreement was made or because the agreement did not turn out to be an advantageous one").
Plaintiff relies on Addesa v. Addesa, 392 N.J.Super. 58, 70-71, 919 A.2d 885 (App. Div.2007), where the husband and wife entered into a property settlement agreement on a fifty-fifty basis. The wife claimed that the husband misled her as to the actual value of a company in which he had an interest. Id. at 68, 919 A.2d 885. The husband claimed that the company was worth $642,920 when it was sold not long after for $16 million. Ibid. We upheld the trial court's finding that the agreement was unconscionable because the distributions made to the wife did not reflect the parties' intent to divide their assets equally. Id. at 71-73, 919 A.2d 885. In making its determination, the trial court specifically found that the correct value of the assets differed markedly from their book value. Id. at 72, 919 A.2d 885.
Plaintiff's reliance on Addesa is misplaced. In Addesa, we did not focus on the issue of unconscionability; moreover, the dispute involved equitable distribution, rather than a family business relationship. Finally, Addesa involves procedural unconscionability. The husband intentionally concealed the true value of the asset at the time the property settlement agreement was executed. That is not the case here. *1007 There is no claim of concealment at either the inception or anytime during the life of this agreement. Moreover, plaintiff does not offer support for its assertion that the agreement was unconscionable because the partners did not draw it up, particularly given that Booth did not have an interest in the Florida property at the time the agreement was signed.
Finally, contrary to plaintiff's assertion, the trial judge did not find that plaintiff was estopped from claiming unconscionability because of the particulars of the buyout of Michael's interest. Rather, it found, in effect, that that buyout was precedent, or support, for a similar buyout of Claudia's interest.
We reiterate what is critical about this agreement and its terms. This was a family partnership created by and funded (except for the modest contributions by the children) by Robert for the benefit of his children according to his terms. He intended the beneficiaries to be family members and understood that the buyouts would require the children to provide funds to the other children. The possibility or even probability that a surviving child would be the ultimate beneficiary of the assets of the partnership was apparent on the face of the agreement. Judge Contillo did not abuse his discretion by finding that the buyout provision was not unconscionable.
Affirmed.
NOTES
[1] Because we refer to various members of the Cohen family, for ease of reference, we use their first names.
[2] No explanation was offered as to the discrepancy between that figure and the amount actually paid to Michael's estate.