**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1326-20

D.M.C.,[1]

      Plaintiff-Respondent,

v.

K.H.G.,

      Defendant-Appellant.

_____

| |
| --- |
| **APPROVED FOR PUBLICATION** |
| **February 22, 2022** |
| **APPELLATE DIVISION** |

      Argued January 27, 2022 – Decided February 22, 2022

      Before Judges Alvarez, Haas, and Mawla.

      On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FM-15-1271-16.

      Darren C. O'Toole argued the cause for appellant (Law Office of Darren C. O'Toole, LLC, attorneys; Darren C. O'Toole and Alexa N. Joyce, of counsel and on the briefs).

      Bonnie C. Frost argued the cause for respondent (Einhorn, Barbarito, Frost & Botwinick, PC, attorneys; Bonnie C. Frost and Jessie M. Mills, on the brief).

      The opinion of the court was delivered by

---

[1] We use the parties' initials pursuant to Rule 1:38-3(e).

MAWLA, J.A.D.

Defendant K.H.G. appeals from a January 8, 2021 order denying her motion to vacate a January 25, 2018 final judgment of divorce (FJOD), which incorporated a property settlement agreement (PSA). We affirm.

In April 2016, plaintiff D.M.C. filed a complaint for divorce ending the parties' thirty-one-year marriage. During the marriage, defendant was employed as a guidance counselor and later vested in the Teachers' Pension and Annuity Fund (TPAF); plaintiff owned a tavern, other businesses, and properties. Since 2000, defendant has been diagnosed with bipolar disorder, manic type with psychotic features, schizophrenia, paranoid type, and schizoaffective disorder, bipolar type. After her initial diagnosis, defendant experienced fifteen psychiatric inpatient hospitalizations, including a breakdown following the filing of the divorce complaint.

In September 2016, the parties' counsel entered a consent order appointing Diana L. Anderson as plaintiff's guardian ad litem (GAL). The order granted Anderson, an attorney specializing in elder and guardianship matters, "full access to all information regarding defendant's situation" and provided for a six-month review of her role as GAL. The order also memorialized defendant's right to revoke her consent to the GAL's appointment.

The court also entered a case management order in October 2016 memorializing that defendant retained a forensic accountant "to value plaintiff's business interest in [the tavern,] . . . his interests in various real estate entities, determine the plaintiff's economic cash flow from all sources, prepare a marital net asset statement, and perform a tracing analysis as it relates to specific marital bank accounts." Plaintiff retained his own expert to "perform a forensic evaluation of [the] business and cash flow."

In February 2017, the court entered a pendente lite order adjudicating various relief sought by the parties. Defendant sought $6,000 per month in pendente lite support and plaintiff argued the figure should be $2,000 per month. The court noted both children were emancipated and awarded defendant $4,100 per month. In April 2017, the court entered an order, noting it heard oral argument and took testimony from the GAL, appointing the GAL as attorney-in-fact for defendant "to make any and all financial decisions," and allowing the GAL to attend all court proceedings on defendant's behalf. The order directed defendant to undergo psychiatric evaluation, permitted the GAL to accept defendant's Social Security Disability (SSD) retroactive payment, and ordered her to establish an account for the SSD and pendente lite funds.

A-1326-20

The GAL filed an order to show cause in the Probate Part asking the court to grant a judgment of guardianship appointing the parties' two adult children as co-guardians. The application cited two 2017 assessments diagnosing defendant with "Schizoaffective Disorder, Bipolar Type, Continuous with Paranoia." The evaluations, which were based on a review of defendant's medical records and interviews, concluded defendant did not have the cognitive capacity to make decisions for herself.[2] One doctor found that since February 2015, defendant "demonstrated continuous severe psychiatric issues with fixed delusions[,] . . . [and] impulsive behavior, including excessive spending . . . ." The other doctor reached a similar conclusion.

On October 16, 2017, the Probate Part judge entered a judgment declaring defendant incapacitated, finding her "incapable of governing herself and managing her affairs and unable to consent to medical treatment." The court appointed the parties' son and daughter, then approximately twenty-eight and twenty-six years of age, as defendant's permanent co-guardians and directed the co-guardians to participate in the divorce on defendant's behalf.

---

[2] Contrary to defendant's arguments on appeal that the doctors performing the evaluations did not meet with her, each doctor noted defendant refused to meet with them, which was symptomatic of her paranoia.

4

On October 27, 2017, the Family Part judge entered an order denying plaintiff's motion to reduce the pendente lite support citing defendant's incapacitation and the costs of her care. The judge also denied defendant's requests for counsel fees, finding the fees excessive because defendant's attorney requested $100,000 and predicted she would need an additional $50,000 to attend mediation. The judge also noted defendant's counsel lacked the authority to request fees because defendant was declared incapacitated and the decision should be left to the guardians "who . . . were just appointed, [to] determine whether continued litigation at the expense of the marital estate is prudent or necessary."

The judge also reviewed a certification filed by the forensic accountant, noting his firm had incurred over $48,000 in fees and was seeking nearly $23,000 for outstanding fees and an advance of $10,000. The expert opined plaintiff's 2015 monthly cash flow was $21,633 but attached no analysis to support the opinion. The judge also noted the expert's bills provided only a summary "with no breakdown" and "[s]ome of the monthly totals, which exceed $10,000, appear excessive. Moreover, the court has reviewed [defendant's expert's] certification and notes the same is close to a net opinion in that he provides little factual support necessary for his conclusions." The judge denied

A-1326-20

the request for expert fees, observing they exceeded plaintiff's expert fees, "who appears to have handled the bulk of assembling the financial information." The judge ordered Anderson continue serving as GAL.

The co-guardians terminated the expert and retained new divorce counsel. The court held a settlement conference, which was attended by both counsel, plaintiff, the co-guardians, and the GAL. On January 25, 2018, the matter settled, and the court entered the FJOD. Anderson was dismissed as GAL the same day. Plaintiff was sixty-two and defendant fifty-seven years of age when they divorced.

The PSA required plaintiff continue paying defendant the monthly $4,100 pendente lite support until sale of the marital residence. Defendant received a $61,500 tax free alimony buyout, which the PSA stated was based on the following considerations:

> A. [Plaintiff] had a 2016 cash flow of $97,731 as calculated by his forensic accounting expert . . . ;
>
> B. Upon entry of a divorce judgment [plaintiff] will lose the medical insurance coverage he currently receives as part of [defendant's] retirement package which will cost him approximately $1,500 per month post-divorce judgment;
>
> C. [Defendant] has [a] pension income of $3,036 per month or $36,432 annually; [and]

6

A-1326-20

> D. [Defendant] has [SSD] [i]ncome of $1,967 per month or $23,604 annually.

The PSA stated the buyout would be included in the monthly equitable distribution payment, which is discussed below.

The PSA contained a mutual alimony waiver and stated: "In entering this waiver of alimony, both parties recognize that generally alimony waivers are modifiable based upon significant changes in circumstances. The parties, however, have agreed that the alimony waiver contained herein shall be non-modifiable." The parties also agreed they could not maintain the marital standard of living set forth in their respective Case Information Statements (CISs).[3]

Regarding equitable distribution, the parties agreed to sell the marital residence and equally divide the proceeds. The PSA identified plaintiff's seventy percent interest in three corporate real estate entities, valued at $790,551, of which defendant received forty percent. The PSA noted plaintiff owned fifty-two percent of the tavern, valued at $270,400, and awarded defendant thirty percent of the value.

---

[3] The PSA did not attach the CISs or otherwise identify them. The appellate record only contains plaintiff's July 13, 2016 CIS showing a joint marital lifestyle of $14,955 per month and three pages of defendant's December 6, 2016 CIS without the budget section of the document.

Other assets included three loans receivable. One note paid $7,027 per month with a balloon payment due in April 2020 of $719,000. The parties agreed plaintiff would retain the monthly payments on the note to pay the costs of the marital residence pending its sale. After the sale of the marital residence, the PSA provided for an equal equitable distribution of the note and the interest until the balloon payment was made. On the second note, defendant received $35,000 representing fifty percent of the principal balance and an additional equitable distribution payment of $2,800, in exchange for plaintiff retaining the note. Plaintiff retained the third note and defendant received $24,668.50, representing thirty percent of its value and an additional equitable distribution of $2,467.

The PSA also gave defendant a credit in equitable distribution for 100% of a $50,000 loan made to the parties' son. The value of the parties' private retirement accounts was equalized by crediting plaintiff fifty percent of the difference, or $134,017. Plaintiff waived any interest in defendant's TPAF pension benefits.

The PSA attached an equitable distribution schedule prepared by plaintiff's expert setting forth the value of each asset and showing an equal final distribution of the value of the marital assets of $919,789 to each party. The

8

parties' assets were largely comprised of retirement accounts, the loans receivable, and the business assets. The PSA stated plaintiff would pay defendant her share of the assets in 180 monthly installments of $4,945.84 following the closing on the marital residence.[4] Defendant's equitable distribution obligation was secured by a stock pledge agreement of his fifty-two percent interest in the tavern and a mortgage against his seventy percent interest in one of the commercial properties.

The PSA also established an irrevocable trust naming defendant as the beneficiary to "privately pay for [defendant's] long-term care, whether at home or in a facility, and [in consideration of plaintiff's] anticipated expenses related to his remaining in the community . . . ." The trust's term was a minimum of sixty months and could be terminated by the children, who were appointed as trustees. The trust also named the children as the remainder beneficiaries. Plaintiff was required to deposit $4,100 within thirty days of the divorce judgment to fund the trust.

The PSA stated each party would retain all other assets, property, and debts held in their individual name, free and clear of the other's interest. Each

---

[4] The total payout was $890,252, representing the sum plaintiff owed defendant net of the marital assets subject to equitable distribution in her name.

party was also responsible for their own counsel and expert fees incurred while negotiating the PSA.

The PSA also memorialized the parties had fully disclosed all income, assets and liabilities to each other, were advised of the right to retain experts and engage in discovery, and waived "the right to complete formal discovery proceedings." The agreement stated:

> The parties further acknowledge that [plaintiff] has provided [defendant's attorney] with the opportunity to review financial information including, but not limited to, balance sheets, personal and business tax returns, insurance information and other documents relating to [plaintiff's] financial affairs. [Defendant] acknowledges that she is waiving the right to have such financial analysis completed deeming, once again, the terms and provisions of this [a]greement to be fair and equitable notwithstanding the failure to complete such an analysis.

In February and April 2019, defendant obtained evaluations from two doctors different than those who evaluated her when the guardianship complaint was filed. Each doctor concluded she had returned to mental competency and could make decisions for herself. A third evaluation took place in September 2019, conducted by one of the doctors who previously declared her incapacitated. He, too, concluded defendant could make her own decisions and was "no longer a candidate for guardianship" but recommended her children

10

monitor her for "signs of psychiatric decompensation[,] . . . medication noncompliance and have a mechanism to enforce psychiatric treatment and protect her finances" because "she is of high risk of having another psychiatric decompensation and/or deciding to stop taking her medications" given her history. In December 2019, the Probate Part judge terminated the guardianship and declared defendant competent.

In November 2020, defendant filed a post-judgment motion challenging the PSA. In pertinent part, the motion sought to: vacate the judgment of divorce and PSA; schedule a plenary hearing to address alimony and equitable distribution; schedule a case management conference to set a discovery schedule; and modify alimony and equitable distribution obligations based on changed circumstances.

Defendant certified the children should not have been involved in the divorce because they "were not neutral parties" and were under plaintiff's "financial influence and control." She asserted the children did not protect her interests and were influenced by plaintiff because they were negotiating a settlement including assets they stood to inherit and "[p]laintiff was paying their expenses . . . ."

11

Defendant claimed the PSA's alimony and equitable distribution provisions were "grossly inequitable" because "[p]laintiff retained the vast majority of [the] marital assets, and [she] was left with nothing . . . ." She alleged the income derived from plaintiff's CIS and relied upon during the settlement process was low because it did not explain how the parties supported the marital lifestyle budget, and the alimony provision was based on a cash flow analysis by plaintiff's expert, who was partisan. She further asserted the alimony calculation included her pension income, which was subject to equitable distribution, and could not be used to calculate alimony. She requested open durational alimony "of at least $5,000 per month" and noted she previously received $4,100 per month pendente lite. Defendant's certification did not include an updated CIS.

Defendant also argued she was entitled to a fifty percent equitable distribution of all the marital assets. She characterized the payment of equitable distribution over time and into a trust as "patently unfair," and contended there was a substantial change in circumstances because she was no longer incapacitated and did not require long-term care. She accused plaintiff of structuring the equitable distribution as a long-term payout because he was funding the children's lifestyles, undervaluing the marital assets, and improperly

12

omitting interest from the equitable distribution payout. Furthermore, she alleged she should have been paid interest on the equitable distribution of the notes receivable or received a lump sum and should have shared in the note once the balloon payment was tendered. She asserted the equalization of the retirement accounts, including the accounts in her name, was unjust.

Plaintiff's opposition to the motion explained the lengthy history of the case, including the process of appointing the GAL and guardians. He certified his income declined after the PSA was signed due to the COVID-19 pandemic and because the tavern had a fire. He explained his CIS was accurate, noting the income information was derived from the parties' tax returns and the alleged increased income defendant claimed actually comprised both parties' incomes. The assets were valued by the forensic accountant and the properties were formally appraised; the equitable distribution protected defendant from her own "unstable behavior." Defendant had a GAL, guardians, was represented by counsel, and "had trusts created on her behalf and received $890,252 equitable distribution[,]" evidencing the fairness of the process.

The parties' daughter, a mental health counselor and a Board-Certified Behavior Analyst, denied any financial influence from her father and stated she became a guardian "to protect [defendant] and hired the appropriate

13

professionals to assist . . . in ensuring that she receive[d] what she [was] entitled to and that the divorce settlement was fair." She terminated the first divorce attorney because defendant "was placing many calls, texts and emails in her manic and paranoid state and was constantly being charged for these calls based upon [her] review of [the] lawyer's bills." She certified the lawyer "appeared to be taking financial advantage of [defendant]" and if she and her brother were not protecting defendant's interests, defendant would have "spent hundreds of thousands of dollars feeding into her delusions and paranoia." Plaintiff assisted her with rent while she pursued her master's degree, but neither she nor her brother received financial assistance or gifts from plaintiff. On the contrary, she noted defendant offered to fly her to Maui during graduate school and promised her she would never have to worry about money if she moved there with defendant.[5]

Plaintiff also supplied a certification from Anderson confirming defendant was unable to participate in the litigation and required the appointment of the guardians. She certified she "participated in the four-way settlement negotiations regarding the [PSA], worked with the [c]o-[g]uardians in creating

---

[5] One of the doctors who submitted an evaluation opining defendant was incapacitated recounted how defendant had impulsively moved to Hawaii and become psychiatrically hospitalized there.

A-1326-20

[and] funding an irrevocable trust for [defendant]" and was not dismissed until the FJOD was entered.

Defendant's reply averred Anderson only wanted to make money from her and did not protect her interests. Additionally, she claimed the daughter contacted her nurse practitioner and therapist, and lied about her mental health status. She attached an undated text message supposedly authored by the daughter, which read:

> I just wanted to reach out after over a year of not talking to you and let you know that you are STILL number one on my list for the most selfish, self-centered, HORRIBLE person. Yes you are schizophrenic (which [I] do empathize and pray for you for) but that doesn't give you an excuse for being a borderline/narcissistic person. Your mother . . . was more of a MOTHER to me my entire lifetime than you EVER were to me. Any memory of my childhood[] was [g]rammy as my motherly figure. Go play victim to whoever you want in [your] new life because that's what you're good at.

Defendant accused plaintiff of understating his income following the fire to obtain loans, stealing her jewelry, and mischaracterizing her spending habits.

The motion judge heard oral argument and concluded the settlement process was fair. There was no bar to the children serving as guardians merely because they stood to inherit from plaintiff, as the inheritance was a contingent benefit. He found no evidence the children were financially motivated and

15

rejected the argument the GAL was influenced because plaintiff paid her bills from marital funds. The daughter's text did not explain how the son, the GAL, and the divorce attorney failed to protect defendant's interests. Thus, there was no evidence "the children dictated the scheme to the attorneys and the attorneys simply presented it to the [c]ourt," or that the children, GAL, and the divorce attorney were colluding against defendant.

Given the circumstances, the terms of the settlement were not unconscionable. The judge opined the alimony provision was a product of negotiation since plaintiff was approaching retirement age. The equitable distribution amount was nearly equal and mere disagreement with the expert who valued the assets was not grounds to undo the PSA. The judge noted defendant's return to competency did not constitute grounds to set aside the agreement because there was evidence she could relapse.

On appeal, defendant argues:

> I.    THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S NOTICE OF MOTION TO VACATE THE FJOD PURSUANT TO NEW JERSEY COURT RULE 4:50-1(F) AS DEFENDANT MADE A CLEAR SHOWING OF INEQUITY AND UNFAIRNESS.
>
> . . .

16

B. THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO GRANT DEFENDANT RELIEF PURSUANT TO R[ULE] 4:50-l(F) AS DEFENDANT FILED HER APPLICATION WITHIN A REASONABLE TIME.

C. THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO GRANT DEFENDANT RELIEF PURSUANT TO R[ULE] 4:50-l(F) AS DEFENDANT MADE A SHOWING OF INEQUITY AND UNFAIRNESS.

i. DEFENDANT MADE A SHOWING THAT THE APPOINTMENT OF THE CHILDREN OF THE MARRIAGE AS HER CO-GUARDIANS DURING THE DIVORCE PROCEEDINGS WAS UNFAIR AND UNJUST.

ii. DEFENDANT MADE A SHOWING THAT THE PSA WAS UNFAIR AND INEQUITABLE AS THE EQUITABLE DISTRIBUTION SCHEME WAS STRUCTURED BASED ON NUMBERS PROPOSED BY PLAINTIFF'S EXPERT WHICH WAS REBUTTED BY DEFENDANT'S EXPERT'S INITIAL REPORT.

II. THE TRIAL COURT ERRED IN FAILING TO FIND THAT DEFENDANT'S RETURN TO CAPACITY WAS A SUBSTANTIAL CHANGE IN CIRCUMSTANCES WARRANTING A MODIFICATION OF THE PARTIES' PSA.

17

. . .

B. THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT'S APPLICATION TO MODIFY THE PSA WHERE DEFENDANT MADE A PRIMA FACIE SHOWING OF A CHANGE IN CIRCUMSTANCES.

"Rule 4:50-1 provides for relief from a judgment in six enumerated circumstances." In re Est. of Schifftner, 385 N.J. Super. 37, 41 (App. Div. 2006). Rule 4:50-1 does not provide "an opportunity for parties to a consent judgment to change their minds; nor is it a pathway to reopen litigation because a party either views his [or her] settlement as less advantageous than it had previously appeared, or rethinks the effectiveness of his [or her] original legal strategy." DEG, LLC v. Twp. of Fairfield, 198 N.J. 242, 261 (2009). "Rather, the rule is a carefully crafted vehicle intended to underscore the need for repose while achieving a just result." Ibid. Thus, the rule "denominates with specificity the narrow band of triggering events that will warrant relief from judgment if justice is to be served" and "[o]nly the existence of one of those triggers will allow a party to challenge the substance of the judgment." Id. at 261-62.

Rule 4:50-1(f) allows a party to petition for relief from a final judgment or order for "any . . . reason justifying relief . . . ." Relief under the rule "requires the demonstration of 'exceptional circumstances.'" Schifftner, 385 N.J. Super.

18

at 41 (quoting Court Inv. Co. v. Perillo, 48 N.J. 334, 341 (1966)). A movant must show that the enforcement of the judgment "would be unjust, oppressive or inequitable." Eaton v. Grau, 368 N.J. Super. 215, 222 (App. Div. 2004) (quoting Harrington v. Harrington, 281 N.J. Super. 39, 48 (App. Div. 1995)).

We review a decision on a Rule 4:50-1 motion for an abuse of discretion. U.S. Bank Nat'l Ass'n v. Guillaume, 209 N.J. 449, 467 (2012). An abuse of discretion exists "when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Id. at 467-68 (quoting Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 123 (2007)). However, if a judge makes a discretionary decision but acts under a misconception of the applicable law or misapplies the law to the facts, we "need not extend deference." Johnson v. Johnson, 320 N.J. Super. 371, 378 (App. Div. 1999).

## I.

We do not address at length defendant's claim the motion judge predicated his decision on her failure to file the Rule 4:50-1(f) motion within a reasonable time. Although defendant filed her motion nearly two years after the settlement, the motion was filed eleven months after the Probate Part declared her no longer incapacitated, which was within a reasonable time. R. 4:50-2. A thorough

reading of the transcript shows the judge reached the merits of the motion and did not reject it on grounds of timeliness.

## II.

Unconscionability exists when there is "overreaching or imposition resulting from a bargaining disparity between the parties, or such patent unfairness in the contract that no reasonable person not acting under compulsion or out of necessity would accept its terms." Howard v. Diolosa, 241 N.J. Super. 222, 230 (App. Div. 1990). The characteristics of unconscionability are: "(1) unfairness in the formation of the contract; and (2) excessively disproportionate terms." Est. of Cohen ex rel. Perelman v. Booth Comput., 421 N.J. Super. 134, 157 (App. Div. 2011). Unconscionability contains two elements, procedural and substantive. Id. at 158. Substantive unconscionability "suggests the exchange of obligations [is] so one-sided as to shock the court's conscience." Ibid. (quoting Sitogum Holdings, Inc. v. Ropes, 352 N.J. Super. 555, 564 (Ch. Div. 2002)).

## A.

Defendant asserts she demonstrated the settlement process and the settlement itself were unfair and unconscionable, thereby meeting the exceptional circumstances standard to vacate the PSA under Rule 4:50-1(f). She

cites <u>Marsico v. Marsico,</u> 436 N.J. Super. 483, 493 (Ch. Div. 2013), which holds that a GAL cannot have personal interest in the case, and if so, the interest must be disclosed. She asserts the same principle applies to the children's appointment as her guardians because they were not neutral and were under plaintiff's control. She asserts the daughter had "extremely harsh and negative feelings" towards her, and for the first time on appeal, she claims the son failed to provide an accounting of her finances, which proves he could not represent her best interests. She claims vacating the PSA would not be prejudicial.

Defendant points to the unequal distribution of the business and the notes receivable, the lump sum alimony, the payout of equitable distribution over time, and the division of her retirement account as evidence of the PSA's unconscionability. She argues a more equitable settlement would grant her a greater interest in the business and notes, continued spousal support, and a one-time payment to fund the trust.

B.

> <u>Rule</u> 4:26-2(a) provides that a "mentally incapacitated person shall be represented in an action by the guardian of either the person or the property." When a "mentally incapacitated person" is not represented by a guardian, paragraph (a) authorizes the court to appoint "a [GAL] . . . in accordance with paragraph (b) of this rule." <u>Ibid.</u> A judicial determination of mental incapacity, however, must precede the appointment of a guardian.

21

See R. 4:86-1 to -8; N.J.S.A. 3B:12-24 to -35. Paragraph (b) of Rule 4:26-2 sets forth the initial procedure that follows when a person is alleged to be mentally incapacitated.

[S.T. v. 1515 Broad St., LLC, 241 N.J. 257, 277 (2020).]

A GAL's role is to be "an independent factfinder who works to determine what action is in the ward's best interests and makes that recommendation to the court." Vill. Apartments of Cherry Hill, N.J. v. Novack, 383 N.J. Super. 574, 579 (App. Div. 2006) (citing In re M.R., 135 N.J. 155, 173-74 (1994)). A guardian must "determine[] . . . what action is in the ward's best interest and advocate[] for that position" and "serve[] the court on the ward's behalf." Ibid. (citing M.R., 135 N.J. at 173-74).

In appointing a guardian, "the court should consider the recommendations of the court-appointed attorney and the wishes of the incapacitated person, if expressed. A person who is incapacitated may nonetheless still be able to express an intelligent view as to his choice of guardian, which view is entitled to consideration by the court." In re Guardianship of Macak, 377 N.J. Super. 167, 176 (App. Div. 2005). "If there is a significant issue as to the appropriate choice of guardian, or as to the underlying issue of incapacity, the court may

A-1326-20

appoint a [GAL] to advise the court as to the person's best interests." Ibid. (citing M.R., 135 N.J. at 176-78).

Defendant's reliance on Marsico is misplaced because that case addressed the role of a GAL, and the children were not court appointed as GALs. Marsico is not binding on us in any event.

Here, there was no impropriety in the appointment of the children as co-guardians to warrant vacating the judgment under Rule 4:50-1(f). Following defendant's breakdown in April 2016, Anderson was appointed as GAL. She conducted her investigation and filed a complaint for the appointment of the children as co-guardians, providing the court with the certifications of a psychologist and physician opining defendant was unable to govern her own affairs. The GAL testified before the Probate Part judge, who then declared defendant incapacitated and accepted the GAL's recommendation to appoint the children as co-guardians in October 2017.

Defendant produced no objective evidence to support her claim the children, who were emancipated at the time of their appointment, were under plaintiff's financial control or acted against her interests. Defendant failed to provide context for the text message from the daughter. Although we cannot ignore the words used in the text, as the motion judge observed, defendant failed

to show they led to an unjust outcome in settling the divorce. Instead, the objective evidence in the record shows the children protected defendant by taking prudent measures to control the costs of the litigation and settling the case in concert with a GAL who was a competent attorney and with the assistance of a matrimonial attorney.

Defendant also produced no evidence beyond her self-serving certification that the children controlled the GAL and the attorney. That defendant's children were her co-guardians does not persuade us they should not have been appointed.

B.

"Equitable distribution of marital property is 'intimately related to support,' and '[t]he power to distribute property equitably should be exercised to relieve the strain of total reliance on support payments for financial security.'" Conforti v. Guliadis, 128 N.J. 318, 324 (1992) (alteration in original) (quoting Lepis v. Lepis, 83 N.J. 139, 153-54 (1980)).

> This demands more than simply "mechanical division[,]" it requires a "weighing of the many considerations and circumstances . . . presented in each case." Stout v. Stout, 155 N.J. Super. 196, 205 (App. Div. 1977) . . . .
>
> However, an equitable distribution does not presume an equal distribution. See Rothman [v.

> Rothman, 65 N.J. 219, 232 n.6 (1974)].    Rather,
> N.J.S.A. 2A:34-23.1, requires an equitable distribution
> be "designed to advance the policy of promoting equity
> and fair dealing between divorcing spouses."  Barr v.
> Barr, 418 N.J. Super. 18, 45 (App. Div. 2011).
>
> [M.G. v. S.M., 457 N.J. Super. 286, 294-95 (App. Div.
> 2018) (first alteration in original).]

Pursuant to these principles, we fail to see the unjust result manifested in the settlement itself.  The fact the parties used the valuation figures presented by plaintiff's expert to settle the case does not establish the alleged unconscionability of the PSA and is not unusual in matrimonial cases.  See N.H. v. H.H., 418 N.J. Super. 262, 281, 283-84 (App. Div. 2011) (rejecting appellant's argument the settlement was unconscionable because there was not "full and broad discovery in search of comprehensive valuations of all of the parties' assets" where instead the parties settled the case using the figures from the expert's "agreed-upon streamlined valuation of the marital property.").  Here, defendant offered no evidence establishing the valuations the parties relied upon were incorrect other than to argue the guardians should not have terminated her expert.

Nor are we convinced the settlement was unconscionable because the assets were not divided equally.  This is not unusual where, as here, one party operates a business subject to equitable distribution or retains the risk associated

25

with an asset; i.e., plaintiff's retention of the loans receivable and the risk associated with collecting them while paying defendant her share of the asset. Regardless, defendant received one-half the total value of marital assets. Moreover, the payout of equitable distribution into a trust was appropriate considering the context of the settlement, namely, defendant's ongoing incapacity at the time of settlement.

We are unconvinced the alimony buyout rendered the PSA unconscionable considering the equitable distribution, the parties' ages, that they would have to support separate households, and the fact the PSA contemplated "privately pay[ing] for long-term care, whether at home or in a facility." As the motion judge noted, the buyout was a product of compromise. Moreover, the level of pendente lite support does not convince us the alimony should have been based on that number because the record lacks findings by the pendente lite motion judge regarding pendente lite support amount or the marital lifestyle. Further, the parties agreed they could not maintain the marital lifestyle, and the record supports that conclusion as well.

### III.

Defendant argues the motion judge erred by not finding a change in circumstance warranting a modification of the terms of the settlement; her return

to capacity and the dissolution of the guardianship signifies she does not require long-term care contemplated by the PSA. Furthermore, she now can manage her finances. She asserts the psychological assessments used to terminate the guardianship support her position, and the doctor who expressed concerns she would relapse was influenced by the daughter who "has been diligently, willfully, and maliciously attempting to discredit and embarrass" her. On the other hand, defendant acknowledges that doctor's opinion that safeguards are necessary to ensure she takes her medications, but asserts she is now compliant and intends to remain compliant.

Matrimonial agreements are enforceable as contracts, "subject, however, to Lepis and [Rule] 4:50-1 considerations as well as considerations of unconscionability, fraud or overreaching." Harrington, 281 N.J. Super. at 46. When parties seek to modify an alimony award, they must "demonstrate that changed circumstances have substantially impaired the ability to support [themselves]." Lepis, 83 N.J. at 157. Whether a changed circumstance "has endured long enough to warrant modification of a support obligation . . . turn[s] on the discretionary determinations of Family Part judges, based upon their experience as applied to all the relevant circumstances presented, which we do

not disturb absent an abuse of discretion." Larbig v. Larbig, 384 N.J. Super. 17, 23 (App. Div. 2006).

The Lepis change in circumstances standard does not apply to equitable distribution. Rosen v. Rosen, 225 N.J. Super. 33, 35-36 (App. Div. 1988). Therefore, the motion judge did not err in declining to modify the equitable distribution provisions of the PSA based on a change in circumstances.

The PSA's alimony clause included an anti-Lepis provision. Parties are free to enter into agreements departing from the general "need-based" Lepis rule and establish their own standards by which they agree to be guided in cases involving "reasonably foreseeable future circumstances . . . ." Morris v. Morris, 263 N.J. Super. 237, 241 (App. Div. 1993). Anti-Lepis provisions, which purport to waive the right to future modification, are enforceable in certain circumstances, unless the agreement is "unreasonable" and are modifiable in "extreme cases." Id. at 246.

The parties' anti-Lepis clause was enforceable given the totality of the circumstances, including their ages, needs, and the equitable distribution terms. Moreover, defendant did not establish her ability to support herself was "substantially impaired," to warrant vacating the anti-Lepis clause. Lepis, 83 N.J. at 157. Indeed, any motion to modify a support obligation requires the

movant to supply the court with both their current and prior CIS. R. 5:5-4(a)(4). Defendant's motion did not append her current CIS. For these reasons, the record lacked the evidence necessary to enable the motion judge to invoke the court's "equitable powers" under Morris, notwithstanding the anti-Lepis provision.

## IV.

In sum, we hold the appointment of a party's adult child to serve as their guardian in a divorce proceeding pursuant to Rule 4:26-2(a) does not in itself render the subsequent settlement of the case unconscionable. The party seeking to undo the settlement must demonstrate misconduct by the guardian and that it led to an unconscionable settlement. Because defendant did not meet her burden in either respect there is no basis to disturb the PSA.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1326-20